Royal **RUSSELL** and Gulf States Energy Corporation, Appellants,

v.

W. Scott **CLARK**, Appellee.

No. 20709.

Court of Civil Appeals of Texas, Dallas.

Aug. 7, 1981.

Rehearing Denied Sept. 15, 1981.

Charles H. Awalt, Dallas, for appellants.

Wayne Pearson, Burford & Ryburn, Dallas, for appellee.

Before ROBERTSON, STOREY and STEPHENS, JJ.

STEPHENS, Justice.

This is a suit for libel resulting from a letter written by defendant, a practicing attorney, to plaintiffs' investors seeking evidence for use in pending litigation. The trial court granted defendant's motion for summary judgment from which plaintiffs appeal. The controlling question is whether the letter is absolutely privileged. We conclude that it is, and affirm.

After the supreme court's reversal and remand to the trial court of an earlier case, and prior to the new trial in that case, W. Scott Clark, defendant in this case, who was the attorney for certain parties in the earlier case, wrote a letter to several of plaintiff's investors, which plaintiff contends is false, malicious and defamatory. As a result of this letter, Royal Russell, the sole shareholder of Gulf States Energy Corporation, and Gulf States brought this suit against Clark for libel. The earlier case which prompted the letter, arose over a dispute as to title to two oil and gas leases, to which Russell and Gulf States claimed title, as did numerous other parties. Russell and Gulf States had exercised control of and had drilled several wells on the disputed leases. Russell and Gulf States sought to quiet title to the leases in them, and alternatively, to recover their drilling costs. In the earlier case, styled *Brannon v. Gulf States Energy Corporation*, 562 S.W.2d 219 (Tex.1977), the supreme court reversed and remanded, instructing the trial court that if it found that Gulf States had no interest in the leases in question, then in that event, Gulf States would be entitled to its reasonable expenditures in drilling and developing the leases, *provided* the court found that Gulf States had acted in *good faith* in its belief of its superiority of title. Thus, on remand, Gulf States' recovery of its drilling and development costs rested squarely on the question of its good faith.

After the remand, Clark mailed the following letter:

December 7, 1978

TO THE INVESTORS THROUGH GULF STATES ENERGY IN THE MARTIN 202 ACRE TRACT IN COLEMAN COUNTY, TEXAS

Re: Brannon et al v. Gulf States et al, No. 9960, Coleman County District Court, Texas

Gentlemen:

Each of you receiving this letter is carried in the records of Coleman County as a partial assignee of Gulf States Energy Corporation with respect to the Clara Odessa Martin 202 acre tract that is the subject of three years' litigation. The Supreme Court of Texas has ruled in favor of my clients, Brannon and Thompson, holding that our 1973 lease (purchased from the IRS at a tax lien sale in May, 1975) is superior to the 1975 lease under which Gulf States claims.

The case now goes back to the District Court in Coleman to determine if Gulf States was in good faith in drilling the three wells on the Martin property in view of our adverse claim. If found to

have had a good faith belief in his title, Royal Russell of Gulf States will be entitled to reimbursement for reasonable expenses in drilling this property. Thus, there are two issues: His reasonable good faith belief that his title was superior, and the question of what constitutes a reasonable expenditure in mining the oil and gas from this 202 acre tract.

At the end of July, 1975, and again around August 11, 1975, before any drilling had been done, I wrote two stern warnings to Royal Russell and Gulf States and their attorney advising that we had a superior lease and they would be trespassing. They wrote back claiming their title was superior and plunged ahead with two wells before we could get a lawsuit filed, and drilled a third well after this lawsuit was filed. I suspect, but do not know, that some of the solicitations of money from you folks was made after my two warning letters, and certainly was made with full knowledge that we had bought the older lease at the IRS sale. Their main contention was that rentals had not been paid on the old lease in November, 1974, and that it had expired. However, we introduced into court a letter from Gulf States to landowner Clara Martin enclosing the rentals on her 202 acre tract in January, 1975; she accepted and deposited the late payment of rentals which validated the 1973 lease that my clients bought at the IRS sale. The crux of the Supreme Court case was that Royal Russell could not come in and argue that he was purchasing a new lease when he forwarded the $202.00 check in January, 1975, since his letter quite clearly stated it was for rentals and not a bonus for a new lease. We believe the Court also found it implausible that Russell would pay Mrs. Martin $202.00 as bonus for a new lease in January, and then not take anything in writing for her until the following July, knowing that the property was getting valuable because of approaching production, and knowing that the lease on the property was being sold publicly by the IRS in May, 1975.

It has been our contention in all of the hearings on this matter that Gulf States drilled two excess wells, that one well would have sufficed. Mr. Brannon, who is a petroleum engineer graduate of Texas University and has been in the oil business for many years, drilled a single well offsetting this property to the south and has produced almost double the revenue from that single well than Gulf States has achieved from three wells. We believe the reason he drilled three holes was to promote each separate hole and thereby make a profit on each well drilled. However, we have not been able to get information from him on how much money was promoted. Incidentally, in each well he kept over half interest even though we suspect your money was paying for the entire cost of drilling.

If Gulf States obtains a judgment upon the retrial for reimbursement of any of the drilling costs, and if he does not remit the reimbursement to you, he is being further enriched. You might be interested to know we offered to convey each of you who has a recorded interest in his now invalid July, 1975 lease the same interest in our valid 1973 lease, if he would drop the suit for reimbursement. Our theory was that he had not been out the money, that you investors advanced the money for drilling these wells and thus Gulf States had no loss in the matter. We stand a good chance of winning this re-trial, or holding the recovery to the cost of one well, so you would have been much better off under our compromise offer. However, he and his attorney, through whom the offer was communicated, impliedly rejected the compromise by ignoring it and asking for a setting on the case.

This is quintessentially the thrust of this case, although there are other somewhat meaningless facets that have been injected into the case at one time or another. One reason I am writing you is to ask if you will please advise me what amount of money you invested in the Martin 202 acre wells through Gulf

States. As I mentioned, he has refused to give us that information. According to assignments on record, Gulf States has transferred an eighteen per cent (18%) interest to investors in Well No. 1, about thirty-six per cent (36%) in Well No. 2, and about forty-eight per cent (48%) in Well No. 3. We have indirect information that Gulf States charged $1,500.00 per one per cent (1%) interest.

I am sorry this experience has turned out dismally for you people. Realization that you were victimized by some highly dubious promotional techniques (Royal Russell and Gulf States are both under a federal injunction prohibiting the selling of oil and gas interests) led to our compromise offer that has been rejected.

Please give me the information on how much you contributed, what percent you were given for your contribution, and which well your contribution relates to. Also, I would appreciate information on whether you were solicited after about August 14, 1975, which was several days after I had sent two warnings to Gulf States to stay off the property.

Thank you for your assistance.

Yours very truly,
s/s Scott Clark
W. Scott Clark

Russell and Gulf States seek damages for the publication of this letter, contending, contrary to Clark's defense, that it contains false and malicious statements and is neither absolutely nor conditionally privileged.

An absolutely privileged communication has been held to be one for which, by reason of the occasion on which it was made, no remedy exists in a civil action for libel or slander, even though the statements made, whether oral or in writing, are false and are uttered or published with express malice. *Reagan v. Guardian Life Insurance Co.*, 140 Tex. 105, 166 S.W.2d 909 (1942). This doctrine is founded on public policy, and it is considered in the interest of public welfare that all persons should be permitted to utter their sentiments and speak their thoughts freely and fearlessly upon all questions and subjects, and no action for words so spoken or written can be sustained, although falsely made with express malice. This class of privileged matter is founded on public policy, and the question of malice cuts no figure in connection with it. *Koehler v. Dubose*, 200 S.W. 238 (Tex. Civ.App.—San Antonio 1918, writ ref'd).

■ It is no longer seriously questioned that all proceedings in courts of this state are absolutely privileged, and in no event will any part thereof afford grounds for an action of libel. *Reagan v. Guardian Life Insurance Co. of Texas, supra.* This court has held that even perjured testimony offered during the course of a trial, is absolutely privileged and cannot form a basis for civil liability. *Clark v. Grigson*, 579 S.W.2d 263 (Tex.Civ.App.—Dallas 1978, writ ref'd n. r. e.)

■ Although Texas has not yet extended the doctrine of absolute privilege to out-of-court communications made by attorneys preliminary to a judicial proceeding, or in connection therewith, we think the doctrine should be so extended. Public policy demands that attorneys be granted the utmost freedom in their efforts to represent their clients. To grant immunity short of absolute privilege to communications relating to pending or proposed litigation, and thus subject an attorney to liability for defamation, might tend to lessen an attorney's efforts on behalf of his client. The conduct of litigation requires more than in-court procedures. An attorney must seek discovery of evidence, interrogate potential witnesses, and often resort to ingenious methods to obtain evidence; thus, he must not be hobbled by the fear of reprisal by actions for defamation. Yet this absolute privilege must not be extended to an attorney carte blanche. The act to which the privilege applies must bear some relationship to a judicial proceeding in which the attorney is employed, and must be in furtherance of that representation.

■ In our view, a correct statement of the law is found in the Restatement of Torts (Second), section 586 (1977), as follows:

An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.

Comment a under this section is as follows: The privilege stated in this Section is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients. Therefore the privilege is absolute. It protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth, or even his knowledge of its falsity. These matters are of importance only in determining the amenability of the attorney to the disciplinary power of the court of which he is an officer. The publication of defamatory matter by an attorney is protected not only when made in the institution of the proceedings or in the conduct of litigation before a judicial tribunal, but in conferences and other communications preliminary to the proceeding. The institution of a judicial proceeding includes all pleadings and affidavits necessary to set the judicial machinery in motion. The conduct of the litigation includes the examination and cross-examination of witnesses, comments upon the evidence and arguments both oral and written upon the evidence, whether made to court or jury.

The rule set forth in this section of the Restatement of Torts has been followed by a number of other jurisdictions. *See Brown v. Collins*, 402 F.2d 209 (D.C.Cir. 1968); *Theiss v. Scherer*, 396 F.2d 646 (6th Cir. 1968) (applying to Ohio law); *Johnston v. Cartwright*, 355 F.2d 32 (8th Cir. 1966) (applying Iowa law); *Borg v. Boas*, 231 F.2d 788 (9th Cir. 1956); *Ascherman v. Natanson*, 23 Cal.App.3d 861, 100 Cal.Rptr. 656 (Ct.App.1972); *Sussman v. Damian*, 355 So.2d 809 (Fla.Dist.Ct.App.1977); *Richeson v. Kessler*, 73 Idaho 548, 552, 255 P.2d 707 (1953); *Zirn v. Cullom*, 187 Misc. 241, 63 N.Y.S.2d 439 (Sup.Ct.1946); *Bull v. McCluskey*, 615 P.2d 957 (Nev.1980); *Strycker v. Levell*, 183 Or. 59, 190 P.2d 922 (1948); *Rodgers v. Wise*, 193 S.C. 5, 7 S.E.2d 517 (1940); *Western States Title Insurance Co. v. Warnock*, 18 Utah 2d 70, 415 P.2d 316 (1966); *McNeal v. Allen*, 95 Wash.2d 265, 621 P.2d 1285 (1980) (en banc); *Bergman v. Hupy*, 64 Wis.2d 747, 221 N.W.2d 898 (1974).

This rule has not been limited to statements made in the course of a pending lawsuit. In Massachusetts the doctrine has been extended to an attorney's communication to a prospective defendant provided it relates to a proceeding under serious contemplation. *Sriberg v. Raymond*, 370 Mass. 105, 345 N.E.2d 882 (1976). Likewise, in *Sriberg v. Raymond*, 544 F.2d 15 (1st Cir. 1976), the United States Court of Appeals for the First Circuit has applied the rule to a communication to a third party. In that case the libelous communication was a letter by an attorney to the president of a corporation complaining that an agreement to purchase stock had been breached. A copy of this letter was mailed to the corporation's bank, who was the escrow agent. It was admitted that although the escrow agent would be named as a party to the suit, it would only be as a stakeholder, and not a real party in interest. Consequently, the complaint was made that the substance of the letter, other than notice of the prospective suit, bore no claim against the escrow agent, and therefore the publication of the libelous matter to the escrow agent was not within the privilege. The court rejected this contention reasoning that upon examination of the attorney's viewpoint, in sending the letter to the escrow agent, it became apparent that the attorney might well have believed that by sending the letter and calling to its attention the alleged scheme against his client, the escrow agent might be induced to withdraw its participation and turn over the escrow funds to his client and that as so viewed, despite the escrow agent's status as only a neutral stakeholder, this bore some relation to the proposed litigation. The court pointed out

that undue restrictions would make the privilege meaningless.

Also, in *Chard v. Galton*, 277 Or. 109, 559 P.2d 1280 (1977), the Supreme Court of Arizona dealt with the degree to which an attorney's absolute privilege should extend in communications preliminary to possible litigation. In that case, the defendant's attorney had written a letter to a representative of plaintiff's insurer seeking to settle an automobile accident case. The letter contained statements that plaintiff had been previously involved in a fatal accident while in a drunken stupor. The court reasoned that although plaintiff's past pattern of alcoholic problems had no direct bearing on the actual litigation of defendant's present claim, these problems would be significant in settlement negotiations and held that the context of the letter met the test of "some relation" to the proposed litigation.

We are persuaded that the rule set out in the Restatement of Torts (Second), section 586 (1977) is consistent with Texas public policy and should be adopted. Under this rule we hold that the question of the relationship of the defamatory matter to a proposed or existing judicial proceeding is a question of law, to be determined by the court. In doing so, the court must consider the entire communication in its context, and must extend the privilege to any statement that bears some relation to an existing or proposed judicial proceeding. All doubt should be resolved in favor of its relevancy. Applying this standard, we conclude, from a review of Scott's letter, that it bears a relationship to the litigation about which it was written in that it appears to be designed to obtain information that may be used as evidence. Consequently, it is absolutely privileged.

Affirmed.