248 N.J. Super. 318 (1991)
590 A.2d 1223
GEROLD KANENGISER, PLAINTIFF,
v.
SIDNEY KANENGISER, ALAN JACOBSON, JEANNE KANENGISER, CARL WEINER, BARBARA KANENGISER, EXECUTRIX OF THE ESTATE OF IRVING KANENGISER, SIDNEY KANENGISER, AS SOLE SURVIVING TRUSTEE OF THE ESTATE OF FANNIE KANENGISER, SIDNEY KANENGISER, AS SOLE SURVIVING TRUSTEE OF THE ESTATE OF MORRIS KANENGISER, ROSE JACOBSON REVOCABLE TRUST, LENARD JACOBSON, COUNTY ARENA, INC., A CORPORATION OF NEW JERSEY IN DISSOLUTION, KENDALL PARK ROLLER RINK, A CORPORATION OF NEW JERSEY IN DISSOLUTION, BAYSHORE ROLLER RINK, INC., A CORPORATION OF NEW YORK IN DISSOLUTION, SILLS, CUMMIS, ZUCKERMAN, RADIN, TISCHMAN, EPSTEIN AND GROSS, A PROFESSIONAL CORPORATION, AND GERALD SPAN, INDIVIDUALLY, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided March 14, 1991.
*321 Joseph Gordon for plaintiff (Gordon & Kanengiser, attorneys).
Jerald D. Baranoff for defendants Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross and Gerald Span (Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, attorneys; Jerald D. Baranoff of counsel and on the brief; Anthony J. Monaco on the brief).
Sheppard A. Guryan for defendants Sidney Kanengiser and Alan Jacobson (Lasser, Hochman, Marcus, Guryan & Kuskin, attorneys).
VILLANUEVA, J.S.C.
Plaintiff's complaint contains four causes of action, the principal one alleging that an attorney's letter seeking repayment of legal fees is "libelous and actionable per se." This letter sought the return of the excess over what the attorney alleged to have been the reasonable legal fee and questioned the propriety of a brokerage commission and stated defendants' intention to seek arbitration of the reasonableness of the legal fee before the appropriate forum and demanded the return of the "brokerage commission."
Defendants, Sidney Kanengiser, Alan Jacobson, Sills, Cummis and Gerald Span, by their two separate attorneys, have moved for summary judgment to dismiss three counts of the complaint which are based upon this letter on the grounds of absolute privilege.
The court holds that this letter clearly indicating an intention to arbitrate the reasonableness of legal fees pursuant to R.1:20A-1 et seq. was "preliminary to a proposed judicial proceeding" and, therefore, is absolutely privileged and also cannot give rise to non-libel causes of action.
The secondary issue is whether limited distribution of the letter to trustees and beneficiaries of a trust from which the payments were made and to the financial adviser to one trustee, *322 who also was the husband of a class beneficiary, was "unreasonable publication" that defeated the absolute privilege. The court holds that such distribution did not defeat the absolute privilege because all recipients of the letter had a significant interest in the matter or connection to it.

I.

Preliminary Statement.
This action revolves around correspondence dated October 4, 1990, from attorney Gerald Span to attorney Gerold Kanengiser. (Appendix A). This letter was not the first occasion when the two attorneys communicated. One year earlier Span, a partner in the Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross ("Sills") law firm, had been asked to represent Sidney Kanengiser ("Sidney") in an accounting action brought against him as the last surviving trustee of his father's trust by the children of his late brother Marvin. Span, in undertaking that representation, had repeated contacts with Gerold Kanengiser because the firm of Gordon & Kanengiser ("G & K"): (a) had represented the Kanengiser Trust until after Marvin's death in 1988; (b) had represented the Kanengiser Trust and the individual investors from the Kanengiser family in selling four roller rink properties in 1987; and (c) was still representing Marvin's estate and its executrix Beverlee Kanengiser, Marvin's second wife (but not the mother of his children), who were suing Sidney.
Span's representation of Sidney caused him not only to investigate whether monies flowing from the Kanengiser Trust to Marvin or Beverlee went beyond permitted "income" and reached into proscribed distribution of corpus (which was to be left entirely for the grandchildren), but also to determine whether Sidney had unwittingly engaged in any transaction involving the Kanengiser Trust for which he might be surcharged as the last fiduciary of the trust. As a result thereof, Sidney turned over to his attorneys, documents relating to the *323 sale by the family entities of four roller rink properties in 1987 out of which attorney Gerold Kanengiser claimed entitlement not only to $100,000 in legal fees, but also a separate brokerage commission amounting to approximately 3% of the $6,400,000 selling price (actually $200,000).
Installment payments from that 1987 sale were still being received for distribution to the former owners (including the Kanengiser Trust) by Sidney as one of the two persons acting for the now dissolved entities. Therefore, Sidney believed that his conduct in continuing to pay (and failing to demand return of payments from) G & K could be questioned by the beneficiaries because the Kanengiser Trust, from which Marvin's children demanded an accounting, had owned a substantial interest in the roller rinks which had been sold.
After obtaining the concurrence of the Jacobson family, who also had an interest in the roller rink proceeds, Sidney authorized Span to send a demand letter to G & K requesting justification of what appeared to be excessive legal fees and of the claim for a real estate commission which is violative of the well-settled public policy limiting the receipt of commissions to those specially licensed as brokers.
By September 1990, Sills had already commenced a separate legal action on Sidney's behalf against Beverlee and the estate of Marvin to recover the allegedly improper prior distributions of corpus to Marvin and Beverlee, which were made without the acquiescence or consent of Marvin's children. Having been unable for more than a year to resolve this matter privately with G & K (who represented Marvin's estate and his widow), Sidney's attorneys had no choice but to commence formal litigation against the clients of G & K. Hence, by the time of the Span letter of October 4, 1990, two civil actions had already been commenced regarding the conduct of members of the Kanengiser family who were at one time represented by G & K.
The letter of October 4, 1990, read in the overall context of communications with G & K, could be described as "the opening *324 salvo" of what would have been, absent plaintiff's preemptive filing of this complaint,[1] the third and fourth legal proceedings regarding the affairs of the Kanengiser family entities.
In these motions for summary judgment defendants contend that the statements contained in the Span letter, made while there were two pending judicial proceedings and as a preliminary to the commencement of two others (for return of legal fees in fee arbitration and an action to declare the "commission" agreement void as against public policy), are clothed with an absolute privilege.

II.

Statement of Facts.
Plaintiff's allegations against the Sills defendants arise out of the statements in the Span letter concerning the operation of a family trust as well as family business investments over three decades and the litigation that payments from these investments to family members has spawned. Knowledge of these prior affairs is vital to place the statements in the Span letter in their proper context.

A. The Kanengiser Trust.

Morris Kanengiser, who died in 1952, created the "Kanengiser *325 Trust" in his will.[2] He named his three sons (Irving, Marvin and Sidney) as co-trustees of this trust and also named his three sons and one daughter (Esther Weiner) as income beneficiaries of the trust, all to receive equal one-fourth shares of the income produced by the trust. Morris further provided that the Kanengiser Trust would terminate upon the death of his last child, at which time the entire corpus of the trust would be distributed per stirpes among the children of Irving, Marvin, Sidney and Esther Weiner. Irving, Marvin and Esther Weiner are deceased; Sidney (now the client of the Sills law firm) is the sole surviving child and sole remaining trustee of the Kanengiser Trust. Until February 1989, plaintiff and his law firm, G & K, provided legal services to the Kanengiser Trust and to a variety of family-dominated entities.
Plaintiff is the nephew of Morris and a first cousin of Irving, Marvin, Sidney and Esther Weiner. He is not a beneficiary of Morris' will.

B. The Assets of the Kanengiser Trust.

After the death of Morris, the Kanengiser Trust, along with individual members of the Kanengiser and Jacobson families, purchased interests in various entities that operated roller skating rinks and owned the land upon which they were located. Through the years, G & K provided legal services to these corporations in connection with their ownership and operation of the rinks. Eventually the entities, still represented by G & K, began to divest themselves of their ownership interests in the roller skating rinks.

C. The Four Rinks Transaction.

By late 1987, Kanengiser family members, the Kanengiser Trust, and the Jacobson family shared interests in four corporations, each of which owned one roller skating rink. In the four rinks transaction they sold these four corporations to one buyer *326 for $6,400,000, most of which was received in the form of purchase-money mortgages taken back by the sellers. The four corporations were represented in this transaction by G & K, who charged a $100,000 legal fee. Defendants contend that plaintiff purported to act as the real estate broker for this sale, for which he claims entitlement to a commission of approximately 3% of the total sales price. Plaintiff denies that he either acted as a broker or was paid as a broker. A letter dated December 17, 1987, drafted by G & K contemporaneous with the sale which was signed by the selling entities, purported to acknowledge the brokerage services provided by plaintiff:
The undersigned do hereby acknowledge that by reason of your services in procuring a purchaser for the real property owned by the undersigned, for $6,400,000.00, you are to receive the sum of $200,000.00 payable on cash received in connection with the said sale in the amount of 3% of said cash until the aforementioned sum of $200,000.00 is fully paid. [Emphasis supplied]
Plaintiff has admitted that $200,000 of the monies he claims from the four rinks transaction arises from his "commission" arrangement. In a letter sent to Sidney, dated May 17, 1990, he acknowledged receipt of certain payments from Sidney and informed Sidney that he was applying the payments to brokerage commissions due from the four rinks transaction:
[The funds have] been applied on the account of commission as per the December 17, 1987 agreement. [Emphasis supplied]
The letter also acknowledged receipt of other monies and informed Sidney:
[The funds were] applied against the 3% commission due on the down payment in the original sale. [Emphasis supplied]
After the four rinks transaction was completed, the four corporations were dissolved. The payments due on the purchase-money mortgages realized from the transaction, however, were to continue for many years. The America On Wheels Real Estate Trust ("AOW") was established by a document drafted by G & K to receive and administer these funds. The shareholders of the dissolved corporations became the beneficiaries of AOW.

*327 D. The Marvin Children Litigation.

In March 1988, Marvin, brother of Sidney and son of Morris (the creator of the Kanengiser Trust), died. His estate, with his second wife Beverlee as executrix, selected G & K as its attorneys. Marvin's children (born of his first wife) retained Samuel Saiber to represent their interests. Saiber attempted, without success, to obtain information from G & K (as prior attorneys for the trust and as attorneys for the estate) concerning payments from the Kanengiser Trust to Marvin and Beverlee beyond those permitted by the documents.
In June 1989, Marvin's children instituted two actions in the Probate Part of Superior Court, Law Division, Essex County: In re Estate of Morris Kanengiser and In re Estate of Fannie Kanengiser (collectively, the "Marvin children litigation"). These actions were brought against Sidney in his capacity as sole surviving trustee of the Kanengiser Trust. Sills has represented Sidney in these proceedings, which seek an accounting of the trust assets and the removal of Sidney as trustee. Marvin's children have alleged that the corpus of the trust was improperly distributed to Morris' children, who were entitled only to the income from the trust.
Central to the allegations of Marvin's children is the claim that their late father and his second wife, Beverlee, have improperly received trust corpus. These allegations, therefore, affect the interests of Marvin's estate and Beverlee. Because both the estate and Beverlee were represented by G & K, Span repeatedly contacted plaintiff to inquire about both plaintiff's and Marvin's actions regarding the trusts and the family's affairs. He explained that Marvin's children believed that Marvin's estate and Beverlee had received improper payments of trust corpus, and were demanding return thereof. Span attempted unsuccessfully to resolve the dispute.

E. The Sidney Litigation.

Because the Marvin children litigation could not be amicably resolved with G & K representing Marvin's Estate, Sidney *328 instituted an action against Marvin's estate and Beverlee (the "Sidney litigation") in August 1990. In this action, commenced by Sills and still pending in the Superior Court, Sidney is seeking to recover corpus of the Kanengiser Trust improperly received by Marvin and Beverlee. Morton Bunis, of the Sills firm, has been advised that plaintiff's firm (G & K) will be representing Beverlee and Marvin's estate in that action.

F. The Span Letter.

The entirety of plaintiff's claims in this libel action arise from the statements contained in the Span letter. Defendants contend that Span wrote this letter on October 4, 1990 in the course of Sills' representation of Sidney in the Marvin children litigation, the Sidney litigation, and two imminent proceedings arising out of plaintiff's involvement in the four rinks transaction.
By September 1990, Sidney and Alan Jacobson, acting on behalf of a majority of the interests in AOW (the trust created to distribute the proceeds from the four rinks transaction), informed Span of the details concerning plaintiff's involvement in the four rinks transaction. Sidney informed Span that plaintiff rendered legal services to the corporations which sold the four rinks and also claimed to have acted as broker in the transaction. For his brokerage services alone, plaintiff claimed a commission of approximately 3% of the total consideration, amounting to $200,000.
Sidney and Jacobson informed Span that plaintiff had charged a fee of $100,000 for legal services for the four rinks transaction. Thus, plaintiff was seeking $300,000 in total compensation from the four rinks transaction ($200,000 in commissions and $100,000 in legal fees). Sidney and Jacobson also told Span that plaintiff was seeking an additional $65,500 for other legal work previously performed for AOW. They sought Span's advice concerning plaintiff's claims.
*329 Span advised Sidney and Jacobson that it had been settled law in New Jersey since at least 1981 that a lawyer cannot charge or collect a brokerage commission if he is not separately licensed as a real estate broker.[3] In addition, he informed Sidney and Jacobson that it is unethical for a lawyer to wear the hats of both attorney and broker in the same transaction, even if he were licensed as a real estate broker.[4] He further advised them that the legal fees claimed by plaintiff seemed excessive, and that fee arbitration under the auspices of the New Jersey State Bar Association (actually, the State Supreme Court which appoints fee arbitration committees)  a quasi-judicial proceeding  was available. In response, both Sidney and Jacobson authorized Span to make a formal demand upon plaintiff to return the brokerage fees he had already received, and to pursue all avenues of legal redress available.
Accordingly, Span made a written demand upon plaintiff to return whatever brokerage commissions that he had collected to which he allegedly was not entitled. Span further informed plaintiff that Sidney and Jacobson intended to pursue a fee arbitration proceeding to establish that the legal fees plaintiff was claiming were excessive.
Upon receipt of the Span letter, plaintiff invited Span to "call ... for an appointment" at which they could "discuss the contents" of the letter. Span attempted to contact plaintiff, but his calls were ignored. Rather than "discuss the [matter]," plaintiff instituted the instant libel action and claim for legal fees.

*330 III.

Plaintiff's arguments concerning the merits of his fees and commission in the four rinks transaction are irrelevant.
These motions raise no issues germane to the merits of plaintiff's entitlement to fees or commissions from the four rinks transaction. Nonetheless, plaintiff argues those issues. He now contends that the money he was paid for "procuring a purchaser"  payment he labelled a "commission" in his May 17, 1990 letter to Sidney  is not a commission but only the "percentage portion of his fee and [is a] `contingent fee'."
While defendants maintain that the statements in the Span letter are an accurate description of their claims and proposed actions, the court does not have to determine the merits of the claims to decide these motions.
The litigation to bar plaintiff's claim for a broker's commission because he does not hold a real estate license will implement this State's public policy of barring those without a broker's license from obtaining compensation or other benefits when they purport to render brokerage services. See, e.g., Tanenbaum v. Sylvan Builders, Inc., 29 N.J. 63, 71, 148 A.2d 176 (1959) (public policy is "so strong that neither the [brokerage] contract nor the unlawful efforts made in its pursuit could provide the basis of [a] pecuniary benefit" to one without a broker's license); Solomon v. Goldberg, 11 N.J. Super. 69, 78 A.2d 118 (App.Div. 1950); Kenney v. Paterson Milk & Cream Co., 110 N.J.L. 141, 164 A. 274 (E. & A. 1933); Baron & Co. v. Bank of New Jersey, 504 F. Supp. 1199 (D.N.J. 1981).
Plaintiff also contends in the alternative that even if his real estate brokerage fee is seen as a commission, he should not be held to have violated ethical strictures because Matter of Roth, supra, "has only prospective application." Yet when the Supreme Court Advisory Committee On Professional Ethics was asked in 1983 whether an attorney can wear the hats of broker *331 and lawyer in a real estate transaction, it responded in the negative:
[T]he inherent conflict of interest in such situations is so overwhelming that, even with full disclosure, an attorney should never participate simultaneously as a broker and as a lawyer for either buyer or seller in a real estate transaction. [Ethics Op. 514, 111 N.J.L.J. 381; emphasis supplied]
Plaintiff's claim that he was ignorant of this "inherent conflict of interest" may present an interesting issue as the remainder of this action continues. However, with respect to these motions the issue need not be resolved.

IV.

The statements in the Span letter are absolutely privileged because made in an effort to avoid or resolve two claims prior to litigation.
The case of DeVivo v. Ascher, 228 N.J. Super. 453, 550 A.2d 163 (App.Div. 1988), certif. den. 114 N.J. 482, 555 A.2d 607 (1989) recognized that an absolute privilege attaches to communications by attorneys that have some reference to either pending or proposed litigation; otherwise, attorneys attempting to secure justice for their clients would be inhibited by fear of reprisal in the form of actions for defamation.
The decision in DeVivo is based on the court's recognition that an attorney's efforts on behalf of his client would be severely inhibited if he had to screen his comments and delete all statements that might potentially give rise to allegations of libel:
[Privilege] is warranted in order that an attorney may enjoy the utmost freedom of communication to secure justice for his client [and reflects a] ... policy of affording attorneys wide latitude in communications involved with the representation of their clients.... [228 N.J. Super. at 458, 550 A.2d 163]
In doing so, it cited with approval the Restatement, Torts 2d, § 586 (1977), which provides that even communications "preliminary to a proposed judicial proceeding" are absolutely privileged if "it has some relation to the proceeding." To guide the application of this privilege, the court articulated a two-prong *332 test. It explained that statements are cloaked with immunity if: (i) they are "made in the course of [a] judicial proceeding;" and (ii) they "have some relation to the judicial proceeding." 228 N.J. Super. at 457, 550 A.2d 163. The statements in the Span letter clearly satisfy both prongs of this test.
The court held that "statements made in the course of judicial proceedings even if ... written or spoken maliciously, without any justification or excuse, and from personal ill will or anger against the party defamed" are absolutely privileged. Ibid. The court quoted with approval from Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 117 A.2d 889 (1955):
The most noteworthy illustration of the absolute privilege of immunity is that afforded in judicial proceedings where judges, attorneys, witnesses, parties and jurors are fully protected against defamation actions based on utterances made in the course of the judicial proceedings and having some relation thereto. [Id. at 558, 117 A.2d 889; emphasis supplied]
The statements in the Span letter are absolutely privileged because they were made in preparation for judicial proceedings to which they related  an arbitration proceeding to test the excessive fee plaintiff claims for legal services and an action to deny his claim for a brokerage commission because he does not hold a broker's license. Sidney's claim for return of the "brokerage commission" can be determined in fee arbitration because plaintiff now asserts that all payments to him were for legal services.
The absolute privilege extends beyond formal civil and criminal matters to quasi-judicial proceedings, Id. at 559-561, 117 A.2d 889, which includes proceedings before an administrative agency. DeVivo v. Ascher, supra, 228 N.J. Super. at 458, 550 A.2d 163.
When a client demands a refund of fees already paid or declines payment of a balance due, it behooves the attorney to encourage the client to request fee arbitration under R.1:20A.
*333 Fee arbitration proceedings perform a function "comparable to the judicial function," namely, fixing the rights between an aggrieved client and his attorney regarding fees charged for services rendered. See R.1:20A-1 et seq. (establishing fee arbitration procedure and providing, inter alia, that "[n]o appeal on the merits from the determination of a Fee Committee shall lie."). Accord J.D. Constr. Corp. v. Isaacs, 51 N.J. 263, 268-269, 239 A.2d 657 (1968); Fenning v. S.G. Holding Corp., 47 N.J. Super. 110, 117, 135 A.2d 346 (App.Div. 1957); Restatement, Torts 2d, § 586 (1977), comment f (for purposes of absolute privilege, "[j]udicial proceedings include all proceedings in which an officer or tribunal exercises a judicial function ... [including] an arbitration proceeding....").
The absolute privilege accorded to the communications of counsel does not arise only after the institution of a formal judicial proceeding. Rather, communications occurring preliminary to, or in preparation for, a proposed proceeding are also privileged. Thus, the Restatement of Torts, provides that an absolute privilege extends to reach the communications of an attorney "preliminary to a proposed judicial proceeding." Ibid.
In DeVivo, the Appellate Division observed that "the ability of an attorney to communicate freely when a matter is in controversy is just as important in the preliminary negotiating stage as it is on the day the suit papers are filed with the court." 228 N.J. Super. at 460, 550 A.2d 163.
Further, the court recognized that withholding absolute privilege from attorneys for statements made prior to the institution of formal litigation "might tend to lessen the attorney's efforts on behalf of his clients" and that an attorney "preparing for litigation must not be inhibited by fear of reprisal in the form of actions for defamation." Id. at 460, 550 A.2d 163 (citing Russell v. Clark, 620 S.W.2d 865, 868 (Tex.Civ.App. 1981)). This intuitively evident proposition led the court to "question" Devlin v. Greiner, 147 N.J. Super. 446, 457, 371 A.2d 380 (Law.Div. 1977), a trial court opinion holding that statements *334 made two months prior to the institution of suit  at a time "when litigation ... may not even have been contemplated"  may not be absolutely privileged.
In DeVivo the Appellate Division overstated the extent of the holding in Devlin when it stated that Devlin stands for the proposition that the absolute privilege does not arise "until after suit has been commenced." 228 N.J. Super. at 460, 550 A.2d 163. Devlin merely held that the determination of whether communications prior to the institution of suit are absolutely privileged must be "made on a case-by-case basis." 147 N.J. Super. at 460, 371 A.2d 380. The Devlin court explained that a party seeking the privilege for statements prior to formal institution of suit would have the burden of showing "the connection between the defamatory matter uttered and the subsequent litigation" and that the privilege would be inapplicable if there is "no direct connection" between the two. Ibid. Even the court in Devlin would find that statements that directly relate to an imminent judicial proceeding  statements typically found in an attorney's demand letter or the statements contained in the Span letter  are absolutely privileged. However, the "questioning" of this Law Division case by the Appellate Division in DeVivo renders moot any more detailed discussion of Devlin's significance.
Plaintiff contends that the lawyer/client privilege was lost by violation of 18 U.S.C.A. § 876 because the privilege does not extend to "a communication in the course of legal service sought or obtained in aid of the commission of a crime or a fraud." N.J.S.A. 2A:84A-20(2). There is nothing herein to suggest that Sidney sought Span's advice "in aid of the commission of a crime or a fraud."
Plaintiff contends that the comments made by Sidney to Span that plaintiff's fees were "excessive" represents a waiver of the lawyer/client privilege under N.J.S.A. 2A:84A-29. To the contrary, that statute provides:

*335 A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section. The failure of a witness to claim a right or privilege with respect to 1 question shall not operate as a waiver with respect to any other question.
In support of the proposition that attorneys must be able to communicate freely and without the fear of libel actions when litigation is contemplated but not yet instituted, the Appellate Division in DeVivo cited Lerette v. Dean Witter Organization, Inc., 60 Cal. App.3d 573, 131 Cal. Rptr. 592 (1976); Sriberg v. Raymond, 370 Mass. 105, 345 N.E.2d 882 (1976); and Russell v. Clark, 620 S.W.2d 865 (Tex.Civ.App. 1981). Other cases standing for this proposition include Ascherman v. Natanson, 23 Cal. App.3d 861, 100 Cal. Rptr. 656 (1972); Larmour v. Campanale, 96 Cal. App.3d 566, 158 Cal. Rptr. 143 (1979); Kent v. Connecticut Bank & Trust Co., 386 So.2d 902 (Fla.App. 1980); Johnston v. Cartwright, 355 F.2d 32 (8 Cir.1966) (Iowa law); Kipp v. Kueker, 7 Mass. App. 206, 386 N.E.2d 1282 (1979); Smith v. Suburban Restaurants, 374 Mass. 528, 373 N.E.2d 215 (1978); Sullivan v. Birmingham, 11 Mass. App. 359, 416 N.E.2d 528 (1981); Bull v. McCusky, 615 P.2d 957 (Nev.Sup.Ct. 1980); and Richards v. Conklin, 575 P.2d 588 (Nev.Sup.Ct. 1978). As California's intermediate appellate court explained in Lerette v. Dean Witter Organization, Inc., supra:
[A]ny competent attorney is aware, access to the courts is not an end in itself but only one means to achieve satisfaction for a client. If this can be obtained without resort to the courts  even without the filing of a lawsuit  it is incumbent upon the attorney to pursue such a course of action first. It is equally well established legal practice to communicate promptly with a potential adversary, setting out the claims made upon him, urging settlement, and warning of the alternative of judicial action. [Defendant's] letter is a typical example of such a missive. [131 Cal. Rptr. at 594; citations omitted]
Accord Jones v. RCA Music Service, 530 F. Supp. 767, 768 (E.D.Pa. 1982); Pinto v. Internationale Set, 650 F. Supp. 306, 308-309 (D.Minn. 1986); and Asia Investment Co. v. Borowski, 133 Cal. App.3d 832, 184 Cal. Rptr. 317, 324 (1982).
Plaintiff does not address how a lawyer should present his claim before instituting a law suit without subjecting himself to a libel action.
*336 Plaintiff contends that since Marvin Kanengiser and Marvin Facher agreed to pay his "bills and the payment of bills submitted on account of plaintiff's fees, which was made with full authority of all the stockholders and directors (which, of course, included Sidney Kanengiser and Alan Jacobson)," there was no basis for the Span letter. But, what if the "3% commission" was what it says it was: a real estate brokerage commission? In such case, could Sidney recover what was paid and not pay anything further? What about plaintiff's claims for additional legal fees of $65,000?

V.

Since the Span letter is absolutely privileged, the court need not determine if it was sent "in the course of" and "relates to" the Marvin children litigation and the Sidney litigation.
The Span letter seems to concern issues that are intertwined with the subject matter of the pending litigation. These actions both seek an accounting of the administration of the assets of the Kanengiser Trust. Among the assets of this trust is a substantial ownership interest in AOW.
All facets of the stewardship of the trust by the co-trustees (Sidney, Irving and Marvin) are within the scope of those accounting actions. All distributions of trust assets  including payments made to plaintiff as installments on his broker's commission  are subject to scrutiny as to whether any future payments can or should be made.
Any accounting of the Kanengiser Trust must by necessity concern the administration of the assets of AOW, the very topic of the Span letter. Thus, defendants contend that the Span letter must be viewed as written in the course of Sills' representation of Sidney in the Marvin children litigation and the Sidney litigation.
*337 Courts do not make paper-fine distinctions when analyzing whether a potentially privileged statement "relates" to a judicial proceeding. Rather, it is well-established that "[r]elevance is ... interpreted quite broadly and liberally." DeVivo, supra, 228 N.J. Super. at 461, 550 A.2d 163. To be privileged, statements must merely "have some reference to the subject of the [pending litigation]." Id. at 460, 550 A.2d 163. The DeVivo court reaffirmed its holding in Thourot v. Hartnett, 56 N.J. Super. 306, 308, 152 A.2d 858 (App.Div. 1959), that the privilege extends to statements that merely "have some reference to the subject of the inquiry" and that "[m]atter to which the privilege does not extend must be so wanting in relation to the subject matter in controversy as that no reasonable man can doubt its irrelevancy and impropriety." 228 N.J. Super. at 460, 550 A.2d 163. See also Fenning v. S.G. Holding Corp., supra:
The pertinency thus required is not a technical legal relevancy ... but rather a general frame of reference and relationship to the subject matter of the action ... As to the degree of relevance needed to invoke the absolute shield of this immunity, the courts are most liberal ... for otherwise the speaker or writer would have to decide the question of jurisdiction at his peril, and the sweep of the privilege would be inhibited at the cost of the policy considerations which give it life. [47 N.J. Super. at 118, 135 A.2d 346; emphasis supplied]
Fenning was quoted with approval in DeVivo, 228 N.J. Super. at 460-461, 550 A.2d 163; see also Binkewitz v. Allstate Ins. Co., 222 N.J. Super. 501, 512, 537 A.2d 723 (App.Div. 1988) (when analyzing if allegedly libelous statements "relate to" a judicial proceeding, "[a]ll doubts are resolved in favor of the necessary relation").

VI.

The statements in the Span letter being absolutely privileged cannot give rise to non-libel causes of action.
The court having determined that the statements in the Span letter are absolutely privileged because they were made as a prelude to two imminent proceedings, the privilege accorded to these statements not only immunizes the statements from a claim of libel but the immunity also provides a complete *338 defense to all causes of action arising out of the Span letter, whatever legal label plaintiff chooses to attach to them.[5]
In Rainier's Dairies, supra, in addition to a libel claim plaintiff also claimed that the allegedly libelous statements were actionable as a malicious interference with its business. The Law Division judge dismissed this additional claim because of the privileged nature of defendant's statements. The Supreme Court affirmed, recognizing that it would vitiate the privilege if it allowed conduct privileged from libel allegations to be actionable under an alternate label:
If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial or quasi-judicial proceedings, is really to mean anything, then we must not permit its circumvention by affording an almost equally unrestricted action under a different label. [19 N.J. at 564, 117 A.2d 889]
The privilege from liability for statements made in the course of a judicial proceeding is of common-law origin. Smolla, Law of Defamation (1990), § 8.03[1] at 8-6. Other privileges that immunize speakers from liability for libel have also been held to protect them from liability for other causes of action arising out of the same statements. For example, in Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), the public figure plaintiff was barred from asserting a cause of action for libel by the First Amendment because he could show no "actual malice." After the trial court had awarded him damages for intentional infliction of emotional distress arising *339 out of the same magazine parody that could not support the libel allegations, the Supreme Court reversed because speech privileged by the First Amendment cannot give rise to a tort claim for damages:
[P]ublic figures ... may not recover for the tort of intentional infliction of emotional distress by reason of [a] publication [] ... without showing in addition that the publication [is not privileged by the First Amendment]. [485 U.S. at 56, 108 S.Ct. at 882]
See also Barr v. Mateo, 360 U.S. 564, 569, 79 S.Ct. 1335, 1338, 3 L.Ed.2d 1434 (1959) (absolute privilege from libel accorded federal officials also immunizes against liability for "kindred torts" arising out of the same statements); Carr v. Watkins, 227 Md. 578, 177 A.2d 841, 843 (1962) ("if there was immunity from liability for defamation, there was immunity from liability for the other alleged torts"); McLaughlin v. Copeland, 455 F. Supp. 749, 752 (D.Del. 1978) (result dictated by "[a]uthority, common sense and the policy underlying the absolute immunity").
This rule is predicated on the common sense observation that the privilege exists to counteract the chilling effect that the potential for civil liability would otherwise have on the participants in judicial proceedings. This chilling effect would exist regardless of the tag that plaintiff attaches to his cause of action. Thus, in Binkewitz v. Allstate Ins. Co., supra, plaintiff's complaint, which, inter alia, alleged defamation and various other torts arising out of statements made in a non-judicial informal dispute resolution proceeding, provided our Appellate Division with a vehicle to articulate the reasons why a privilege from libel must immunize the holder from other causes of action arising out of the same statements:
The libel action privilege grows out of the public policy favoring free expression in statutorily-required informal dispute resolution proceedings, without fear of ensuing libel action, short of outright lies or reckless disregard of falsity. An action for tortious interference based on the same verbal conduct would equally chill the free expression we seek to protect. If the public policy is to be effective, "we must not permit its circumvention by affording an almost equally unrestricted action under a different label." Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 564, [117 A.2d 889] (1955) (barring *340 tortious interference action based on defendant's absolutely privileged filing of license revocation proceedings). [222 N.J. Super. at 515, 537 A.2d 723; emphasis supplied]
Accord Middlesex Concrete, etc. v. Carteret Industrial Ass'n., 68 N.J. Super. 85, 91, 172 A.2d 22 (App.Div. 1961) (if defendant is privileged from libel, "he is privileged against this suit for tortious interference"); Cape May v. St. Paul Fire & Marine Ins. Co., 216 N.J. Super. 697, 703, 524 A.2d 882 (App.Div. 1987) (comprehensive general liability policy that insures against libel and slander claims also insures against malicious interference claims arising out of allegedly libelous statements); Lone v. Brown, 199 N.J. Super. 420, 426-427, 489 A.2d 1192 (App.Div. 1985) (absolute privilege accorded statements made in judicial proceedings bars a cause of action for slander of title based on filing of lis pendens); Wendy's of So. Jersey v. Blanchard Manage. Corp., 170 N.J. Super. 491, 494, 406 A.2d 1337 (Ch.Div. 1979) (absolute privilege allows participants in judicial proceedings "to be free from liability for statements made" therein).
In an attempt to elevate form over substance, plaintiff argues that "the extortionist demand count is different from the libel count" and should not be dismissed "even, arguendo, if the libel count is dismissed." Plaintiff makes no effort to show how the extortion cause of action is different from the libel count.
Plaintiff argues that Span committed a federal criminal offense by sending the letter in violation of 18 U.S.C.A. § 876 because it constituted an attempted extortion. Even if it were an extortion attempt, that would not destroy an absolute privilege. If Span committed a federal criminal offense, the United States Attorney would be the appropriate person to whom the complaint should be made.
Contrary to plaintiff's assertions, many cases extend the privilege to reach the extortion label used by plaintiff in the fourth count of the complaint. For example, in Ponzoli & Wassenberg, P.A. v. Zuckerman, 545 So.2d 309 (Fla.App.), review den. 554 So.2d 1170 (Fla.Sup.Ct. 1989), plaintiff made *341 allegations of libel and extortion against defendant-attorney arising out of privileged communications made in the course of judicial proceedings. Recognizing that the privileged nature of the attorney's communication was "clear," the court held the defamation claim "frivolous" and dismissed the extortion count as well:
The same analysis applies to the extortion claim, which is based on the same statement ... The absolute immunity for statements made in judicial proceedings precludes civil liability. [545 So.2d at 310; emphasis supplied]
To the same effect is Fuhrman v. California Satellite Systems, 179 Cal. App.3d 408, 231 Cal. Rptr. 113 (1986), overruled on other grounds Silberg v. Anderson, 50 Cal.3d 205, 266 Cal. Rptr. 638, 642, 786 P.2d 365, 641 (1990) where plaintiff alleged a variety of torts arising out of a lawyer's demand letter and also added a count sounding in extortion. The court, recognizing that the dispatch of demand letters is a "well established legal practice" held that the absolute privilege accorded to statements made as a preliminary to judicial proceedings mandated dismissal of the extortion count:
Any veiled threat contained in such a letter "`is part of the adversary system, and, as such, is to be anticipated in the course of "heated battle" between adverse parties to proceedings considered to be within the context of "judicial proceedings."'" [231 Cal. Rptr. at 118].
Accord Harris v. NCNB Nat. Bank of N.C., 85 N.C. App. 669, 355 S.E.2d 838 (1987) (dismissing libel allegations against attorney on basis of absolute privilege, and finding extortion count did not state claim).
Our Supreme Court has explained that if absolute privilege "is really to mean anything, then we must not permit its circumvention by affording an almost equally unrestricted action under a different label." Rainier's Dairies v. Raritan Valley Farms, Inc., supra, 19 N.J. at 564, 117 A.2d 889.
Therefore, the absolute privilege accorded the statements in the Span letter bars not only libel claims, but also all causes of action arising out of the statements therein.

*342 VII.

Because the Span letter was distributed only to those persons with a connection to the controversy referenced in the letter, it remains privileged.
Plaintiff, in opposing this motion, insisted that he be permitted to inquire about the circulation of the Span letter to third parties. Therefore, the court allowed limited discovery on this issue which indicates that except for Sidney's son-in-law, Richard Yoken, the only persons who received the letter were those who had a pecuniary interest in recovery of legal fees and the brokerage commission.
Span distributed the letter to Gerold Kanengiser, the addressee; to his clients, Sidney Kanengiser and Alan Jacobson, both of whom are parties in this proceeding; to Irving Facher and Marvin Facher; and to Richard Yoken. Sidney also discussed the letter with Yoken on the telephone.
Yoken is the husband of Sidney's daughter Deborah, who is a class beneficiary of the Kanengiser Trust. He is also known to Span as Sidney's financial adviser in family affairs that included, among other matters, Sidney's trusteeship of the Kanengiser Trust.
When Sidney brought to Span's attention the subject of the legal fees and the brokerage commission charged by plaintiff on the four rinks transaction, he explained to Span that Yoken had made him aware of the potential impropriety of plaintiff's claims. Sidney also gave Span a three-page letter, dated September 10, 1990, typewritten on Yoken's company letterhead, Yoken & Company, Inc., Financial Counselling,[6] that Yoken had sent to Sidney bringing these matters to Sidney's attention.
*343 After reviewing Yoken's letter, Span spoke to Sidney and Jacobson concerning the apparent excessiveness of plaintiff's legal fees and the possible impropriety of his brokerage commission claim. Both Sidney and Jacobson then authorized Span to write a demand letter to plaintiff.
Span sent a copy of this letter to Yoken because Yoken's wife is a beneficiary of the Kanengiser Trust and Yoken had brought the matter to Sidney's attention.
Irving Facher and Marvin Facher each own a .152912% interest in AOW and both received a copy of the Span letter from Sidney Kanengiser with a notation thereon by Sidney that they "might be interested in the same."
Both Irving and Marvin Facher say that the letter was written without their knowledge or consent. Notwithstanding their clear financial interest in these alleged improper payments, each certifies:
I have no interest in the said letter financially or otherwise, because I disagree with the contents thereof, and I have no objections to the payment of the fees referred to in the letter or to become due to Gerold Kanengiser by virtue of the services rendered by him to the America on Wheels enterprise.
I desire that the payments be made by the enterprise in full to Gerold Kanengiser, and I have instructed and have made known to Sidney Kanengiser my desire with respect to same prior to receipt of the said letter. Payments have been made to Gerold Kanengiser and I have requested that the payments be continued to be made to him at least to the extent of my proportionate obligation with respect to the entire amount. In all events, I intend to pay my proportionate share of the fees charged by Gerold Kanengiser.
Therefore, Sidney had a right, if not a duty, to send the letter to his cousins, Irving and Marvin Facher, particularly since the payments were being distributed by him and since 1960 Marvin had been a managing executive of all the roller skating rinks and apparently authorized all payments to plaintiff.
A multitude of out-of-state cases confirm the Appellate Division's holding in the DeVivo case that statements made by counsel regarding pending or proposed litigation remain privileged when distributed to persons who are connected to the underlying litigation. See Romero v. Prince, 85 N.M. 474, 513 *344 P.2d 717 (App. 1973). To the same effect is Libco Corp. v. Adams, 100 Ill. App.3d 314, 55 Ill.Dec. 805, 807, 426 N.E.2d 1130, 1132 (1981). Accord Larmour v. Campanale, 96 Cal. App.3d 566, 158 Cal. Rptr. 143 (1979). See also Theiss v. Scherer, 396 F.2d 646 (6 Cir.1968) (attorney's letter questioning motives of plaintiff in contesting will absolutely privileged; copies of letter distributed to legatees under the will); Chard v. Galton, 237 Or. 109, 559 P.2d 1280 (1977) (letter by defendant attorney to plaintiff's liability insurer concerning plaintiff's accident with attorney's client, and referencing plaintiff's previous accident "while in a drunken stupor" absolutely privileged); 50 Am.Jur.2d, Libel and Slander, § 246 at 764 ("A communication, to be privileged, must be made ... to proper parties having a corresponding interest or duty."); Sack, Libel, Slander and Related Problems (PLI 1980) at 272 (absolute privilege applies if "the recipient of the communication [is] an individual who is in some way interested in or connected with the contemplated proceeding").
Plaintiff's reliance upon Citizens State Bk. of N.J. v. Libertelli, 215 N.J. Super. 190, 521 A.2d 867 (App.Div. 1987), is misplaced because that case only establishes that distribution "to persons not connected with [pending or proposed litigation]," Id. at 198, 521 A.2d 867, such as, for example, "to the press" is not privileged. Id. at 199, 521 A.2d 867.
The dissemination of the letter by Span was necessary to keep parties connected to the dispute informed of events in the controversy. Absolute privilege would be rendered meaningless if it could be negated by the limited distribution made by Span.
If the absolute immunity could be lost by virtue of the contents of the communication, then the immunity would not be absolute, by definition, but would be limited. 53 C.J.S., Libel and Slander, § 58, "Absolute Privilege" states:
An absolutely privileged communication is one for which, by reason of the occasion on which it is made, no remedy is provided for the damages in a civil action for slander or libel. [at 110]
*345 Plaintiff contends that Span's sending the letter to, and communicating with, Yoken was "unnecessary or unreasonable publication to one for whom the occasion is not privilege(d)" because Yoken had no interest in the letter as Sidney never mentioned Yoken's name to him. However, even if this were so, Span would not be expected to know whether Sidney ever mentioned Yoken's name to plaintiff.
Yoken first mentioned to Sidney the alleged improprieties and, although not a party to any proceeding, he had a significant interest in the communication and litigation.
What is important is that, based upon what Sidney told him and showed him, Span reasonably believed that Yoken was concerned with, connected to and interested in the dispute. Therefore, his sending the letter to Yoken was objectively reasonable. To say otherwise would be unreasonable, unrealistic and illogical. Furthermore, since Yoken's wife was a class beneficiary of the Kanengiser Trust, she would have been entitled to receive a copy of the Span letter. Had she received a copy it is not only reasonable to believe, but in all probability, that she would have discussed the matter with her husband. To contend that a husband is not interested in his wife's affairs would be to ignore the marital relationship. All husbands, including Yoken, have a right, if not a duty, to look after their wives' interests.
Span's limited distribution of the letter to these persons does not destroy the absolute privilege accorded to statements of attorneys that concern pending litigation or are preliminary to proposed litigation. All the recipients of the letter "had a sufficiently significant interest in the communication and litigation for absolute immunity to apply." The absolute privilege is not destroyed even if the letter is sent to a person not a party, but who had a significant interest in the communication and litigation. DeVivo v. Ascher, supra, 228 N.J. Super. at 462-463, 550 A.2d 163.
*346 Once Sidney became aware that plaintiff's legal fees may have been excessive and there was a question as to the propriety of his brokerage commission, he had a fiduciary duty to proceed to make his claim against plaintiff, at least to send a demand letter.

VIII.

Conclusion.
Defendants' motions for summary judgment to dismiss counts two, three and four of the complaint are granted.

*347 APPENDIX A

SILLS CUMMIS ZUCKERMAN RADIN TISCHMAN EPSTEIN & GROSS

A PROFESSIONAL CORPORATION

ONE RIVERFRONT PLAZA NEWARK, NEW JERSEY XXXXX-XXXX (201) 643-7000 FAX: (201) 643-6500
 PLEASE REPLY TO
 October 4, 1990
 Newark
 Gerold Kanengiser, Esq.
 Gordon and Kanengiser
 159 Millburn Avenue
 Millburn, New Jersey 07041
 RE: America on Wheels
Dear Mr. Kanengiser:
I have been asked by Sidney Kanengiser and Alan Jacobson to review the propriety and reasonableness of the brokerage commissions and legal fees you have billed with respect to the sales of the County Arena, Kendall Park, Bayshore and Bricktown properties.
I have advised Sidney Kanengiser and Mr. Jacobson that unless you were a licensed real estate broker at the time of the transactions you had no right to a real estate commission from the sales of those properties. In addition, even if you were a licensed real estate broker it was an ethical violation for you to also act as the seller's attorney in the same transactions. I refer you to the recent case of In re Lee B. Roth decided by the New Jersey Supreme Court on August 2, 1990, a copy of which is attached. The opinion clearly establishes that this was the law in the State of New Jersey since 1981, and also indicates that because of your dual role you would actually forfeit the real estate commission, even if you had been a licensed real estate broker and were otherwise entitled to receive it.

*348 SILLS CUMMIS ZUCKERMAN RADIN TISCHMAN EPSTEIN & GROSS
 Gerold Kanengiser, Esq.
 October 4, 1990
 Page 2
Furthermore, my initial review of the matter indicates that you have billed your clients $165,500 in legal fees, which after an acknowledgment that $13,000 of that amount was not yet due and payable resulted in a total legal fee demanded by you of $152,500. I have advised Sidney Kanengiser and Mr. Jacobson that in my experience this amount seems excessive and that you should be required to substantiate the time and effort expended in greater detail than you have previously done.
The records provided me indicate that you have receive a total of $274,500 on account of commissions and legal fees. This letter is formal demand that you return the sum of $122,000 representing the excess paid over the net legal fee of $152,500. Your return of this amount would indicate your good faith effort to mitigate and avoid the potential ethics complaint growing out of the dual role you played in the transactions. As to the legal fee it is our intention to seek arbitration of its reasonableness before the appropriate forum.
I would be pleased to discuss these matters with you should you care to do so prior to my referral of these matters to the Real Estate Commission and the appropriate committees governing the practice of law.
 Very truly yours,
 GERALD SPAN
 GS:rr
 Enc.
 cc: Mr. Sidney Kanengiser
 Alan Jacobson, Esq.
 CMRRR
NOTES
[1] Since plaintiff now acknowledges that all his charges were for legal services, the first count of the complaint seeking to recover legal fees is defective as a matter of law because it fails to comply with R.1:20A-6 for failing to "notice his client of the client's option to pursue the fee arbitration remedy...." Chalom v. Benesh, 234 N.J. Super. 248, 261, 560 A.2d 746 (Law Div. 1989). In his haste to file this complaint, plaintiff apparently overlooked this prerequisite to filing a complaint for legal fees. What plaintiff failed to mention in the complaint or any submissions is any bill for legal services for his "brokerage" work. The court has no evidence that plaintiff submitted any bill for legal services by certified or registered mail prior to instituting this law suit, as required by N.J.S.A. 2A:13-6.
[2] Hereinafter all persons with the Kanengiser surname will be identified by their given name only.
[3] See Matter of Roth, 120 N.J. 665, 673, 577 A.2d 490 (1990) (attorney who discharges broker's services without broker's license "acts beyond [his] authority ... and ... improperly as an attorney"); Spirito v. New Jersey Real Estate Commission, 180 N.J. Super. 180, 189, 434 A.2d 623 (App.Div. 1981) ("attorneys are licensed to practice law, not to engage in the real estate brokerage business").
[4] Matter of Roth, supra, 120 N.J. at 677, 577 A.2d 490.
[5] The second, third and fourth counts of plaintiff's complaint assert various causes of action against the Sills' defendants arising out of the statements in the Span letter. The second count alleges that plaintiff was libelled by the Span letter. The third count alleges that, through the Span letter, the Sills' defendants conspired with other defendants in this action to obtain funds belonging to plaintiff "by threats, extortion, intimidation and coercion." It purports to allege violations of unspecified sections of the United States Criminal Code "relative to extortion" and "with respect to plaintiff's civil rights." The fourth count alleges that the Span letter was sent to dissuade various entities from paying funds due to plaintiff and, therefore, "constitutes an intentional and malicious and tortious interference with the rights of the plaintiff."
[6] Upon demand by plaintiff, Span was ordered to give the court, in camera, a copy of this letter for examination. Upon review the court has concluded that it is a privileged communication between Span and Sidney. Evid.R. 26; N.J.S.A. 2A:84A-20. Disclosure of the contents of the letter would not aid in the resolution of these motions.