United States Court of Appeals,

Fifth Circuit.

No. 91–2385.

Stanislaw R. BURZYNSKI, M.D., and Burzynski Research Institute Inc., Plaintiffs–Appellants,

v.

AETNA LIFE INSURANCE COMPANY, et al., Defendants–Appellees.

Aug. 11, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before SNEED[*], REAVLEY, and BARKSDALE, Circuit Judges.

SNEED, Circuit Jue:

Dr. Stanislaw Burzynski and the Burzynski Research Institute, Inc.[1] appeal the district court's dismissal of their lawsuit against AEtna Life Insurance Company, AEtna's law firm in related litigation, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, AEtna's hired consultant in the related suit, Grace Powers Monaco, and a company founded by Monaco, Emprise, Inc. The district court dismissed Dr. Burzynski's entire complaint, with prejudice, on the grounds that certain alleged conduct which supported the complaint was protected by an absolute discovery privilege under Texas law arising from the related suit. Alternatively, the district court dismissed, without prejudice, each of Dr. Burzynski's eleven pleaded counts under Fed.R.Civ.P. 12(b)(6). We find that the district court's application of the Texas discovery privilege was improper under the pleaded facts. A consequence of this holding is that the dismissal without prejudice becomes either erroneous or premature. We, therefore, reverse and remand.

I.

FACTS AND PROCEEDINGS BELOW

---

[*]Senior Circuit Judge of the Ninth Circuit, sitting by designation.

[1]For convenience, we will at times refer collectively to the doctor and his institute as simply "Dr. Burzynski."

Stanislaw Burzynski is a physician and researcher located in Houston, Texas. He advocates an unconventional therapy for the treatment of cancer using substances distilled from human urine which he has named "antineoplastons." According to Dr. Burzynski, when injected into the body, antineoplastons "reprogram" cancer cells to function normally. The Burzynski Research Institute, Inc. (BRI) is a research facility founded by Dr. Burzynski that engages in antineoplaston research and treatment. Dr. Burzynski and his institute have received national television exposure on such shows as "20/20" and "Sally Jesse Raphael."

He also has received attention from federal and state regulatory authorities. In 1983, the Food and Drug Administration barred Dr. Burzynski from interstate transactions involving antineoplaston treatments. The National Cancer Institute and the Office of Technology Assessment of the United States Congress both have issued critical reports of the treatment. In 1988, the Texas Department of Health ordered Dr. Burzynski to cease and desist treating cancer patients with antineoplaston therapy absent FDA new drug or investigational drug approval.

The source of this case is in a suit commenced in August, 1986, by Delores Swanson, a patient of Dr. Burzynski's, against AEtna in an Illinois state court based on AEtna's refusal to pay for antineoplaston treatment under a group insurance policy. AEtna removed to a federal district court in Illinois and the case was subsequently transferred to the Southern District of Texas. Swanson died and Dr. Burzynski intervened as assignee of her claims against AEtna. AEtna then counterclaimed with a civil RICO action charging that Dr. Burzynski fraudulently induced AEtna to pay insurance claims. On March 31, 1992, the district court granted summary judgment to both parties and entered a final, take nothing judgment. *Burzynski v. AEtna Life Ins. Co.,* No. H–89–3976 (S.D.Tex. Apr. 1, 1992) [hereinafter *Burzynski I* ]. The court held that AEtna's refusal to pay was a question governed exclusively by ERISA, and that the determination by AEtna that antineoplaston treatment was not "necessary for the treatment" of Swanson's cancer was a valid exercise of its discretionary authority under the group contract. *Id.* slip op. at 4–7. At the same time, the court also ruled that

AEtna could not succeed in its RICO counterclaim against Dr. Burzynski because AEtna was on notice, by the knowledge of its "agents and/or employees," of the experimental nature of the Burzynski treatment, and that therefore there could be no detrimental reliance on any purported false representation made by Dr. Burzynski. *Id.* slip op. at 9–13.

As part of its pretrial preparation for *Burzynski I,* AEtna hired defendant-appellee, Grace Powers Monaco, as a consultant. Monaco is an attorney and self-described ombudsman specializing in health law, health fraud, and patients' rights. She discloses that the death of a child in 1970 brought about her focus in this area of law. She is a founder of the Candlelighters Childhood Cancer Foundation, which provides assistance, peer support, advocacy and information to parents of children with cancer. More recently Monaco started a small business, Emprise, Inc., also a party in this lawsuit. The purpose of Emprise, according to Monaco, is to develop patient and physician education materials. With federal grant money, Emprise was commissioned to develop a database reviewing unproven and untested cancer treatments.

During the discovery in *Burzynski I* (and while *Burzynski I* was still under the supervision of a federal district court in Illinois), AEtna, through the Hinshaw firm, sent out what Dr. Burzynski describes as an "indiscriminate mass mailing" to "dozens and dozens" of other insurance companies. Prior to the mailing, the Illinois district court had twice addressed the question of access to patient records or patient information concerning patients covered by insurance companies other than AEtna. Out of concern for patient confidentiality and limiting discovery, the court placed what it called "substantial limits on the discovery requests that had been made."

Rather than seek clarification or modification of the limiting orders, AEtna, through its attorneys at Hinshaw, bypassed these limits and obtained appointment of a special process server *from a federal district judge in another division.* Hinshaw then sent out subpoenas to other nonparty insurers, under the guise of special process, seeking information similar to that covered in the earlier

rulings of the Illinois district court.

Not surprisingly, when AEtna's actions came to light, the Illinois court sanctioned AEtna and Hinshaw, ordering that they pay Dr. Burzynski's attorney's fees incurred as a result defending the "ex parte process." Although the court fell short of finding outright bad faith, it did note that the Hinshaw decision to "go after this information without coming back to the Court was almost unconscionable" and "indicated some indifference to the existence of [the] protective order that was in place." Record at 145 (Transcript of Telephone Conference Call, *Burzynski I* (C.D.Ill. Oct. 13, 1989)).

AEtna, through Hinshaw, also sent out a form letter to a large number of insurance companies. The record is unclear whether these letters, either in whole or in part, were sent to those companies subject to the subpoenas. AEtna and Hinshaw describe the letter as an "informal discovery request." That is a rather bland description. It opens: "This letter is sent to you as a result of an action filed by AEtna Life Insurance Company that may directly affect your company. You may have paid and may still be paying claims for cancer treatments of your insureds with an experimental substance used by Dr. Stanislaw Burzynski of Houston, Texas." It next informs the recipient of the pending civil RICO action. Then appears the following sentence: "*This letter is to warn you of potentially fraudulent claims for insurance reimbursement that may have been made to your company* and to ask for your help in obtaining any claim history that your company may have with Dr. Burzynski" (emphasis supplied). The letter also contains several strongly pejorative statements. For example, it labels antineoplaston treatment as "worthless," apprises the recipient of the 1983 FDA action and of unfavorable reports from the medical community on the treatment, notes that Dr. Burzynski has failed to receive FDA approval for the drug, and relays that a "Texas Grand Jury is currently investigating his operation." The letter assesses the national media attention as follows:

> Unfortunately, these programs have, in the past, been arranged in such a way that patients of Dr. Burzynski attest to Burzynski's miracle cure, and the narrator makes Burzynski

appear as a genius excoriated by the medical establishment and the F.D.A.  These programs have brought hundreds of patients flocking to Houston to be treated with "antineoplaston." It closes not only with a request for information, but with an *offer to supply* "any additional information about this matter."

Based partly on this letter and the subpoenas, as well as on other acts that will be discussed below, Dr. Burzynski and BRI launched the current action, *Burzynski II,* in the United States District Court for the Southern District of Texas.  In the complaint, they allege the following:  On the advice of Monaco, AEtna has instituted a tactical policy of impleading doctors in disputed claims litigation on the theory that the doctor will not find it profitable to defend the suit;  that AEtna pays off Emprise (and other organizations like Emprise) to contrive negative data for use in litigation;  that the federal financing for Emprise was obtained by Monaco and AEtna through "numerous misstatements and omissions of fact, the most important of which was the omission of any reference to the intimate working relationship between Monaco/Emprise and AEtna";  that Monaco exploited the Emprise database project by "letting it be known that ... she was available to be retained by alternative health practitioners" and thereby implying that "their evaluation in the database could be influenced";  that AEtna has attempted to have Dr. Burzynski prosecuted by government agencies by supplying these agencies with false and misleading information;  that AEtna has been illegally receiving secret grand jury information through a former U.S. attorney on AEtna's payroll in *Burzynski I,* and finally;  that Monaco has "widely circulated a defamatory "Alert' " about the pending RICO action in *Burzynski I* in an effort to "stop prospective patient's from taking BRI's treatment and to dissuade other scientists from continuing their research and investigation about the treatment."

Based on the above, Dr. Burzynski has fashioned the following claims against the various appellees.  As to AEtna and Hinshaw, he charges that he is a third-party beneficiary of the insurance policies of his patients, and appellees' actions tortiously interfered with rights under those policies. Next, Dr. Burzynski alleges that by sending the form letter and subpoenas, AEtna and Hinshaw interfered with prospective business relationships with various insurance companies.  Dr. Burzynski

also charges that AEtna and Hinshaw are "closely related" to Monaco and Emprise and, therefore, any potential business disparagement committed by AEtna and Hinshaw can be attributed to Monaco and Emprise (and, presumably, vice versa) as a civil conspiracy under Texas law. Dr. Burzynski also alleges that AEtna and Hinshaw violated the Texas Deceptive Trade Practices Act, which provides that "[d]isparaging the goods, services, or business of another by false or misleading representation of fact" is a deceptive trade practice. Tex.Bus. & Com.Code Ann. § 17.46(b)(8).

Dr. Burzynski's charges against Monaco and Emprise generally parallel those filed against AEtna and Hinshaw. The single significant difference falls under his charge that Monaco and Emprise disparaged the business of BRI. Here, Dr. Burzynski alleges that letters sent to the Medical College of Georgia, which was at the time engaging in laboratory research involving antineoplastons, were false and misleading. He makes the same allegations against the Monaco "Alerts." As a result, Dr. Burzynski claims to have lost grant money from the Medical College of Georgia and he asserts that he is no longer able to secure insurance payments for his patients' treatments.

Finally, it is the allegation of Dr. Burzynski that all of appellees, acting in consort, have run afoul of RICO, the Racketeer Influenced and Corrupt Organizations Act. In total, Dr. Burzynski seeks both actual and punitive damages in the amount of $190 million.

AEtna and Hinshaw vigorously dispute Dr. Burzynski's version of what occurred. They first insist that the "mass mailing" letter was no more than a single incident during the course of detailed discovery and that, in any event, a sanction has already been imposed. As to the relationship between AEtna and Monaco, appellees characterize it as simply the act of hiring an attorney for advice in a lawsuit, not civil conspiracy. They support this contention by noting that AEtna did not hire Monaco until after *Burzynski I* was filed. AEtna and Hinshaw point out further that any communication with the Texas grand jury was simply "normal cooperation with a pending grand jury investigation," something that any conscientious citizen is entitled to do. AEtna and Hinshaw also dispute the

allegation that AEtna is connected with Emprise in any way. They argue that Dr. Burzynski alleged no specific facts supporting this allegation, that AEtna has had no role in Emprise's work, that Emprise has not issued any report on Dr. Burzynski, and that no alleged facts support the charge that AEtna was involved in a conspiracy with Monaco to implead physicians for tactical reasons, and that, in any event, such a fact could have no relation to *Burzynski I* since it was Dr. Burzynski that actively intervened in the lawsuit.

Monaco and Emprise also paint a different version of the facts than does Dr. Burzynski. As they see it, their actions in *Burzynski I* constituted "reasonable and conscientious pursuit of lines of scientific evidence and development of defense strategies for a case involving an insurance claim of "unproven and untested' cancer treatment." The complaint in this case, they assert, is no more than an attempt to interfere with legitimate litigation preparation and "particularly with [Monaco and Emprise's] First Amendment right of investigation and inquiry into representations of scientific worth made by a physician who agrees he is using nonstandard, nontraditional cancer treatment," all of which was necessary to the preparation for *Burzynski I.*

On a motion to dismiss, the district court found that all of Dr. Burzynski's causes of action arose "from conduct of these defendants in sending letters to insurance companies to discover information for the use in [*Burzynski I* ]." The court, as already indicated, then dismissed the entire complaint on the grounds that Texas law afforded an absolute privilege to communications made in a court proceeding. Alternatively, the court dismissed, without prejudice, each cause of action under Fed.R.Civ.P. 12(b)(6), for failure to state a claim.

II.

JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction from the final judgment below pursuant to 28 U.S.C. § 1291.

We review the district court's interpretation of Texas law de novo. *Salve Regina College v. Russell,* —— U.S. ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). Our task is to ascertain the content of Texas law "with the aid of such light as [is] afforded by the materials for decision at hand, and in accordance with the applicable principles for determining state law." *Meredith v. Winter Haven,* 320 U.S. 228, 238, 64 S.Ct. 7, 12, 88 L.Ed. 9 (1943). When the law is unsettled, we must attempt to decide the question at hand as would the Texas Supreme Court. *Coatings Mfrs. v. DPI, Inc.,* 926 F.2d 474, 479 (5th Cir.1991).

## III.

## DISCUSSION

The disposition by the district court makes the question presented to us a narrow one: whether, under Texas law, an absolute privilege from suit applies to the "conduct of these defendants in sending letters to insurance companies to discover information for the use in [*Burzynski I* ]." We begin with an analysis of the Texas discovery privilege.

In Texas, as in most states, litigants are afforded broad immunity from suit based on conduct occurring during the discovery process. The reason is plain. Litigants should be free to vigorously investigate their claims without fear of incurring parallel liability. Most recently, the Texas Supreme Court addressed the issue in *James v. Brown,* 637 S.W.2d 914 (Tex.1982)). There, the court held that "[c]ommunications made in the due course of a judicial proceeding will not serve as the basis for a civil action for libel or slander, regardless of the negligence or malice with which they are made." *Id.* at 916 (citing *Reagan v. Guardian Life Ins. Co.,* 140 Tex. 105, 166 S.W.2d 909 (Tex.1942). The court continued: "The privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings...." *Id.* So long as the defamatory matter "has some relation to the proceeding," the privilege is said to apply. *Id.* at 917 (quoting Restatement (Second) of Torts § 588 (1981)); *see also Russell v. Clark,* 620 S.W.2d 865, 869 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.) (quoting same).

According to AEtna and Hinshaw, the inquiry begins and ends with the question whether the alleged defamation bears "some relation to the proceeding." They state: "Burzynski does not deny, and he cannot, that the discovery letters were directly related to the pending judicial proceeding ... [and] on their face seek discovery matters reasonably calculated to lead to admissable evidence." We agree that this observation as it applies to the letters is correct.

However, Dr. Burzynski argues that their purpose transcended litigation. Dr. Burzynski, in effect, asks us to qualify the privilege and to withdraw its shield when litigants (1) purposely seek to exploit the discovery privilege for ulterior, malicious motives, *and* (2) send out the defamatory material to parties who cannot be reasonably believed to have cognizable legal interest in the litigation. We can find no Texas case directly on point. However, publications meeting the two-prong requirement set forth above can neither be said to be in the "due course of a judicial proceeding," *James,* 637 S.W.2d at 916, nor are they, to use the formulation of the *Russell* court, "in furtherance of the representation" of AEtna by the Hinshaw firm, 620 S.W.2d at 868. We think the refinement urged by Dr. Burzynski is a sound one and we are quite hesitant to assume that the Texas Supreme Court, when faced with this issue, would adopt what we regard as an unsound position.

We draw further support from a case arising under New York law, *Bridge C.A.T. Scan Associates v. Ohio–Nuclear, Inc.,* 608 F.Supp. 1187 (S.D.N.Y.1985). In *Bridge,* a party sent a letter to its competitor's customers notifying them of pending judicial proceedings it had filed against the competitor and of allegations that the competitor's product was dangerous and defective. The letter concluded with a request for information "concerning possible difficulties with [the competitor's product] to "aid in the resolution of a nationally important issue concerning the quality of health care.' " *Id.* at 1197. District Judge Weinfeld ruled that the discovery privilege did not apply on those facts. He reasoned that the nature of the communication did not justify a privilege because it was a preliminary inquiry sent to persons "not yet known to possess information germane to litigation." *Id.* at 1198 (quoting *Schulman v. Anderson Russell Kill & Olick,* 117 Misc.2d 162, 168, 458 N.Y.S.2d

448, 453 (N.Y.Sup.Ct.1982)). "The chilling effect of imposing liability for such statements," Judge Weinfeld continued, "does not clearly outweigh an individual's interest in protecting his reputation or a corporation's interest in protecting the reputation of its product." *Id.* The logic is persuasive.

Here, the AEtna–Hinshaw mass mailing was sent, much like in *Bridge,* to companies whose "relationship to the litigation was hypothetical at best." *Id.* Moreover, the letter did not merely seek information relating to *Burzynski I.* Rather, an express purpose was to convince these companies not to pay for Dr. Burzynski's treatment. The correspondence concluded with an offer to supply further information on Dr. Burzynski. From the face of the form letter, we cannot say that both malicious intent and the ulterior motive are not present. We therefore think that it would be unjust to afford AEtna and Hinshaw immunity from suit based on the mass mailing. Truth, of course, will be a defense upon remand. Dr. Burzynski's treatment may be determined to be worthless or perhaps even harmful. We, however, at this point should not make that assumption.

The situation is different with regard to the "ex parte subpoenas," the Monaco "Alerts," and the correspondence with the Medical College of Georgia. Neither the subpoenas nor the Georgia correspondence are a part of the official record, and we are therefore unable to determine whether the privilege should apply. The Alerts, a sample of which is made a part of the record, appear to have no facial connection to the *Burzynski I* discovery process. Apparently, they are simply memoranda, circulated to unknown recipients, which apprise the reader of the then pending RICO counterclaim in *Burzynski I* and of certain other facts relating Dr. Burzynski's history with the antineoplaston treatment. On remand perhaps it can be shown whether these "Alerts" and the Georgia Medical College correspondence are within the protection of the litigation privilege and, if not, whether their words are actionable. On this record such determinations are beyond our reach.

Our holding in this case makes it premature to engage in a Rule 12(b)(6) analysis for each individual count. On remand, the district court will assess the significance of the discovery privilege

as it relates to each relevant document within the record. The district court struck certain documents from the record. Presently we see no abuse of discretion in doing so. However, on remand the district court should be free to shape the record in such manner as it deems appropriate.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.