**BANCPASS, INCORPORATED,**
**Plaintiff–Appellee**

**v.**

**HIGHWAY TOLL ADMINISTRATION,**
**L.L.C., Defendant–Appellant**

**No. 16-51073**

United States Court of Appeals,
Fifth Circuit.

FILED July 13, 2017

---

· Ethan G. Gibson, Nicholas Michael Brown, Fulkerson Lotz, L.L.P., Houston, TX, for Plaintiff–Appellee.

Jonathan Freiman, David R. Roth, Esq., New Haven, CT, James Bicks, Stamford, CT, Wiggin & Dana, L.L.P., Ethan L. Shaw, Shaw Cowart, L.L.P., Austin, TX, for Defendant–Appellant.

Before WIENER, CLEMENT, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Defendant–Appellant Highway Toll Administration, L.L.C., ("HTA") appeals the district court's denial of its summary judgment motion based on Texas's judicial proceedings privilege. HTA argues that, under Texas law, it is absolutely immune from a defamation action brought by its competitor, Plaintiff–Appellee BancPass, Inc., because the communications at issue were related to judicial proceedings contemplated in good faith. BancPass filed a motion to dismiss the appeal, arguing that this court is without jurisdiction to hear the interlocutory appeal or, alternatively, urging that this court dismiss HTA's appeal on the ground that HTA forfeited its right to a pre-trial determination of the privilege question. We DENY BancPass's motion to dismiss and AFFIRM the district court's denial of HTA's motion for summary judgment.

## I

This interlocutory appeal arises out of litigation between rival companies that specialize in highway toll collection technology. In lieu of cash collection, many state tolling authorities—including the Texas Department of Transportation (TxDOT)—now collect highway tolls either partially or entirely through electronic tolling lanes. This generally is accomplished

either through use of a "toll tag"—a windshield-mounted transponder that automatically deducts the toll from the owner's account—or through technology that captures a vehicle's license plate, allowing the state to bill the vehicle's registered owner by mail.

HTA is a private company that contracts with rental-car agencies to manage the billing and payment of electronic highway tolls incurred by their rental cars. HTA registers the license plate numbers of rental cars on its "fleet list" and then pays the tolling authority directly for tolls incurred by those cars. Although the vehicles remain registered to the rental-car companies, the state tolling authority permits the license plates of designated vehicles to be listed on HTA's fleet list solely for tolling purposes. When one of the registered rental cars passes through a toll site, the tolling authority bills HTA's fleet account. HTA then bills the rental car customer for the cost of the customer's accrued tolls, plus a fee for HTA's services.

Appellee BancPass is a competing toll services company. In 2014, BancPass began marketing a cellphone application, the "PToll App," which allows users to photograph their license plates and send those photographs directly to BancPass through the App. BancPass then registers the associated vehicles on its own fleet list. When a covered vehicle passes through a toll site, BancPass pays the tolling authority for the incurred toll and then deducts the cost of the toll from the user's account. One of the benefits of the PToll App is that it allows rental-car customers to add their rental vehicles' license plates to BancPass's fleet list for only the limited pendency of the rental term. By doing so, customers are able to opt out of the default toll-payment systems provided by rental-car companies

and thus avoid the associated fees charged by toll servicing companies such as HTA.

In April 2014, BancPass announced that it would officially launch its PToll App at the September 2014 International Bridge, Tunnel, and Turnpike Association's national conference, the most influential annual conference in the tolling industry. However, after learning that rental-car customers could use the PToll App to pay their incurred tolls, HTA took action to block BancPass's planned launch.

First, on August 13, 2014, HTA's CEO sent a letter to TxDOT's legal counsel expressing the company's "concern" about BancPass's efforts to register with TxDOT the license plates of vehicles owned by rental-car agencies and TxDOT's apparent willingness to prioritize BancPass's registrations over HTA's. The letter additionally notified TxDOT that HTA intended to work with "outside counsel to take any and all legal actions necessary to protect [HTA's] rights under our agreement with TxDOT or Texas Law, and intend[ed] to hold BancPass or its customers responsible with regard to any such actions involving the rental agency vehicles." HTA did not provide a copy of the letter to BancPass or otherwise communicate to BancPass the concern expressed in the letter.

Second, on September 3, 2014, HTA's outside counsel sent letters to Google and Apple, two companies that sold the PToll App in their online stores. The two letters, which were entitled "Illegal 'PToll' App by BancPass," demanded that Google and Apple remove the PToll App from their stores, because it allegedly violated each companies' internal policies and allowed users to "engage in unlawful activities." The letters accused BancPass and its users of a wide array of illegal conduct. For example, the letters claimed that, by allowing users to upload a photo of a rental car license plate and register that vehicle on

BancPass's fleet, the PToll App was requiring its users "to assist in the violation of state vehicle registration laws by falsely representing—or enabling BancPass to represent—that the license plate assigned to the vehicle belongs to the user." The letter claimed:

> [T]his action is in violation of the laws of most (if not all) states prohibiting false statements to the State Authorities in conjunction with the registration of a vehicle or license plate . . . . By misrepresenting, or assisting BancPass in misrepresenting, that a particular rental car and its license plate are part of Banc-Pass's fleet when, in fact, they are not, PToll App users are unwittingly committing a felony.

The letter further warned that the technology would cause a "procedural and financial nightmare" for subsequent users of the rental vehicles, HTA, rental agencies, and state authorities. HTA's outside counsel accused Google and Apple of "facilitating . . . tortious conduct," and warned that, by giving the App "an air of legitimacy," their sale of the App was "intentionally deceptive and unfairly induce[d] users of the PToll App to participate in BancPass's unlawful schemes" in violation of California law. While the letters mentioned that BancPass was "intentionally interfering with the contract between the *Rental Agencies and drivers*," it did not refer to any tortious interference with HTA's own contractual relationships, nor did it allude to the possibility that HTA would pursue legal action against BancPass. The letter merely closed with a demand that Google and Apple remove the PToll App from their online stores, based on its illegality. As with the letter to TxDOT, HTA did not provide a copy of these letters to BancPass or otherwise communicate to BancPass the concerns expressed in the letters.

Finally, on September 30, 2014, HTA contacted BancPass directly and threatened legal action unless BancPass agreed to stop marketing the PToll App to rental-car customers. BancPass declined and instead filed suit in October 2014, seeking a declaratory judgment that its app did not tortiously interfere with HTA's contractual rights. Upon obtaining HTA's letters to TxDOT, Apple, and Google through discovery, BancPass amended its complaint to add a defamation claim based on the content of the three letters. HTA counterclaimed, seeking a declaratory judgment that the PToll App tortiously interferes with HTA's current and prospective contracts.

In its summary judgment briefing, HTA argued for the first time that it was entitled to summary judgment on BancPass's defamation claim, because all three letters were absolutely privileged under Texas law. HTA claimed that Texas's judicial proceedings privilege protected the communications from a defamation claim, as they were made preliminary to a contemplated judicial proceeding. The district court denied summary judgment on the defamation claim, holding that the statements contained in the letters were not covered by absolute privilege under Texas law. The court additionally held that Banc-Pass was entitled to a declaration that the PToll App does not tortiously interfere with HTA's contractual rights.

HTA filed an emergency motion to stay further proceedings pending its anticipated appeal of the district court's denial of its summary judgment motion. In its order denying the motion, the court acknowledged that "HTA is free to file a notice of appeal . . . at which point this Court will be deprived of jurisdiction." The court noted, however, that it "view[ed] HTA's conduct in waiting to advance the absolute immunity defense until summary judgment

... as a litigation tactic designed to avoid trial." This admonition was based on "HTA's conduct in waiting to advance the absolute immunity defense until summary judgment (which took place unusually late in these proceedings given HTA's motion for continuance of the dispositive motions deadline), [and] then announcing its intention to appeal only two days before the docket call and after unsuccessfully moving for a continuance of the trial date."

HTA appealed the district court's order to this court, arguing that its motion for summary judgment based on absolute immunity was "immediately appealable ... under the collateral order doctrine." BancPass moved to dismiss the appeal on two grounds. First, BancPass argued that this court lacks jurisdiction over an appeal of denial of Texas's judicial proceedings privilege that is based on out-of-court statements made in the absence of an ongoing judicial proceeding. Second, BancPass argued that HTA forfeited its right to an interlocutory appeal because the appeal was merely a litigation tactic to avoid trial.

## II

■ "Because the district court's order ... was not a final judgment resolving all the issues of the suit," we must determine whether we have jurisdiction before reaching the merits. *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 747 (5th Cir. 2014). Under 28 U.S.C. § 1291, we have jurisdiction to hear "appeals from all final decisions of the district courts of the United States," except when direct review may be had in the Supreme Court. *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 41, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). "Ordinarily, this section precludes review of a district court's pretrial orders," such as denials of motions for summary judgment, "until appeal from the final judgment." *Sorey v. Kellett*, 849 F.2d

960, 961 (5th Cir. 1988). However, under the collateral order doctrine, the Supreme Court has read the language of § 1291 to permit interlocutory appeals "from a small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" *Swint*, 514 U.S. at 42, 115 S.Ct. 1203 (quoting *Cohen v. Beneficial Indust. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). "That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.*

■ This court has jurisdiction over interlocutory appeals of denials of summary judgment based on claims of absolute immunity. *See, e.g., Shanks v. Allied-Signal, Inc.*, 169 F.3d 988, 991–92 (5th Cir. 1999); *Quirk v. Mustang Eng'g, Inc.*, 143 F.3d 973, 975 (5th Cir. 1998). This is because "[a]n immunity from suit is not only a means of prevailing on the merits, but an 'entitlement not to stand trial or face the other burdens of litigation.'" *Shanks*, 169 F.3d at 991 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). "[A] claim of immunity from suit is 'effectively unreviewable' once the defendant is forced to go to trial, because he or she is permanently deprived of the right to avoid the burdens of litigation." *Id.* (quoting *Swint*, 514 U.S. at 42, 115 S.Ct. 1203).

In *Shanks*, we held that Texas's judicial proceedings privilege is a complete immunity from suit and therefore immediately appealable. We explained:

We are convinced that Texas law regards its privilege for communications made in the context of judicial, quasi-judicial, or legislative proceedings as a complete immunity from suit, not a mere defense to liability. To insist on a final

judgment before reviewing a denial of that immunity could deprive [a defendant] of its entitlement to avoid the burdens of trial. [A defendant] may therefore appeal the district court's rejection of its immunity claim as a collateral order under 28 U.S.C. § 1291.

*Shanks*, 169 F.3d at 992. Under *Shanks*, when the district court denies, as a matter of law, a defendant's summary judgment motion based on Texas's judicial proceedings privilege, this court may exercise jurisdiction over the resulting interlocutory appeal. *Id.*; *see also Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 347 (5th Cir. 2016) ("In *Shanks* we concluded that the litigation privilege provided true immunity under Texas law and, thus, orders denying that immunity were appealable."); *Martinez v. Hellmich Law Grp., P.C.*, 681 Fed. Appx. 323, 325–26, No. 16-50305, 2017 WL 937538, at *2 n.3 (5th Cir. Mar. 8, 2017) (unpublished).

■ Although not directly disputing our conclusions in *Shanks* and *Troice*, BancPass nonetheless argues that, even if this court generally may exercise jurisdiction over an interlocutory appeal from a denial of absolute immunity based on Texas's judicial proceedings privilege, we may not do so here, because the statements made by HTA do not qualify for the privilege. But that is a merits argument, not a jurisdictional one. *See Behrens v. Pelletier*, 516 U.S. 299, 311, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) ("[The question of] whether there is jurisdiction over the appeal ... must be determined by focusing upon the category of order appealed from, rather than upon the strength of the grounds for reversing the order. 'Appeal rights cannot depend on the facts of a particular case.'" (quoting *Carroll v. United States*, 354 U.S. 394, 405, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957))). Thus, we conclude that we have

jurisdiction based on our prior holdings in *Shanks* and *Troice*.

## III

■ Alternatively, BancPass argues that even if we have jurisdiction over this appeal, we should nonetheless grant its motion to dismiss, because the district court's order described HTA's appeal as a "litigation tactic to avoid trial" and, according to BancPass, HTA has thus "forfeited its right to proceed with this appeal." In support, BancPass points to caselaw in this court and other circuits describing an exception to the usual rule that "a notice of appeal ... [gives] the appellate court sole jurisdiction and divest[s] the trial court of jurisdiction to proceed with the case." *United States v. Dunbar*, 611 F.2d 985, 987 (5th Cir. 1980).

We have recognized such an exception in the context of interlocutory appeals of double jeopardy. In *United States v. Dunbar*, sitting en banc, we unanimously concluded that a district court may certify to the court of appeals that an interlocutory appeal of the denial of a double jeopardy motion is frivolous and then proceed with trial rather than relinquish jurisdiction. *Id.* We observed that "[t]he divestiture of jurisdiction rule ... would enable a criminal defendant to unilaterally obtain a trial continuance at [a]ny time prior to trial by merely filing a double jeopardy motion, however frivolous, and appealing the trial court's denial thereof." *Id.* at 988. We explained:

An appropriate balance of conflicting interests should be initially achieved in the trial court itself by identifying frivolous claims of former jeopardy and preventing them from unduly disrupting the trial process. Henceforth, the district courts, in any denial of a double jeopardy motion, should make written findings determining whether the motion is frivo-

lous or nonfrivolous. If the claim is found to be frivolous, the filing of a notice of appeal by the defendant shall not divest the district court of jurisdiction over the case. If nonfrivolous, of course, the trial cannot proceed until a determination is made of the merits of an appeal.

*Id.* Other circuits have since adopted this approach. *See United States v. LaMere,* 951 F.2d 1106, 1108 (9th Cir. 1991); *United States v. Head,* 697 F.2d 1200, 1204 n. 4 (4th Cir. 1982); *United States v. Grabinski,* 674 F.2d 677, 679 (8th Cir. 1982) (en banc); *United States v. Lanci,* 669 F.2d 391, 394 (6th Cir. 1982); *United States v. Leppo,* 634 F.2d 101, 104 (3rd Cir. 1980).

Many of our sister circuits have also recognized the applicability of the *Dunbar* rule to interlocutory appeals of immunity defenses. As the Seventh Circuit observed, interlocutory double jeopardy cases are "so closely parallel to [qualified immunity] appeals that the principles are freely transferable ...." *Apostol v. Gallion,* 870 F.2d 1335, 1339 (7th Cir. 1989). The Seventh Circuit observed:

> Defendants may seek to stall because they gain from delay at plaintiffs' expense, an incentive yielding unjustified appeals. Defendants may take [qualified immunity] appeals for tactical as well as strategic reasons: disappointed by the denial of a continuance, they may help themselves to a postponement by lodging a notice of appeal. Proceedings masquerading as [qualified immunity] appeals but in fact not presenting genuine claims of immunity create still further problems.

*Id.* at 1338–39. Thus, the court concluded that when a "disposition is so plainly correct that nothing can be said on the other side[,] ... a district court may certify to the court of appeals that the appeal is frivolous and get on with the trial." *Id.* at 1339. "The point of [this] procedure ... is to prevent a defendant from disrupting the district court's trial schedule by filing a frivolous appeal." *Chan v. Wodnicki,* 67 F.3d 137, 139 (7th Cir. 1995).

All circuits to reach the issue have uniformly followed the Seventh Circuit's lead, recognizing similar procedures whereby district courts may retain jurisdiction despite the filing of an interlocutory appeal, so long as they certify that the appeal is frivolous or dilatory. *See, e.g., Chuman v. Wright,* 960 F.2d 104, 104–105 (9th Cir. 1992); *Yates v. City of Cleveland,* 941 F.2d 444, 448–49 (6th Cir. 1991); *Stewart v. Donges,* 915 F.2d 572, 576–77 (10th Cir. 1990); *cf. Rivera–Torres v. Ortiz Velez,* 341 F.3d 86, 96 (1st Cir. 2003) (declining to adopt the certification procedures described in *Apostol,* because they "ha[d] no relevance" to the case, but recognizing a district court's power to keep jurisdiction, where "[t]he defendants' notice of appeal was patently meritless, and therefore failed to divest the district court of jurisdiction in the first instance").[1]

BancPass concedes that this court has not yet expressly recognized applicability of the *Dunbar* rule to interlocutory appeals of district court denials of immunities, but urges us to do so here. Although we can locate no case in which this court has formally sanctioned the practice of our sister circuits, a number of district courts in this circuit, citing *Apostol,* have already

---

1. The Supreme Court has noted with approval the Seventh Circuit's certification procedures, observing that "[i]t is well within the supervisory powers of the courts of appeals to establish summary procedures and calendars to weed out frivolous claims." *Behrens,* 516 U.S. at 310–11, 116 S.Ct. 834 (quoting *Abney v. United States,* 431 U.S. 651, 662 n.8, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977)).

certified appeals as frivolous and kept jurisdiction over cases despite the threat of an interlocutory appeal. *See, e.g., McClure v. Biesenbach,* No. SA-04-CA-0797-RF, 2007 WL 4966431, at *3 (W.D. Tex. Dec. 6, 2007); *Hyde v. Stanley Tools,* No. Civ.A 98-2757, 2000 WL 365585, at *2 (E.D. La. Apr. 10, 2000).

■ Our sister circuits' widespread recognition of the *Dunbar* rule in this context persuades us to do so as well. We agree that, like interlocutory appeals of double jeopardy motions, a district court is permitted to maintain jurisdiction over an interlocutory appeal of an immunity denial after certifying that the appeal is frivolous or dilatory. Importantly, this rule is a permissive one: the district court *may* keep jurisdiction, but is not required to do so. Further, we agree with the Seventh Circuit that "[s]uch a power must be used with restraint." *Apostol,* 870 F.2d at 1339.

Nonetheless, the district court order here does not qualify as such a certification. Certainly, the district court expressed its displeasure with the tactics employed by HTA:

It should be noted ... that the Court views HTA's conduct in waiting to advance the absolute immunity defense until summary judgment (which took place unusually late in these proceedings given HTA's motion for a continuance of the dispositive motions deadline), then

announcing its intention to appeal only two days before docket call and after unsuccessfully moving for a continuance of the trial date, as a litigation tactic designed to avoid trial.

However, despite this admonition, the court did not make an express finding that HTA forfeited its right to a pre-trial appeal as a result of those tactics, such that the court could maintain jurisdiction over the case pending appeal. To the contrary, the court found that HTA's filing of a notice of appeal divested it of jurisdiction.

Our sister circuits have generally declined to find forfeiture when a district court did not expressly certify, in writing, that a defendant forfeited the right to a pretrial appeal.[2] Similarly, in *Dunbar,* we stressed the necessity of a written certification and express finding of frivolousness in the double jeopardy context, noting that "[t]he requirement of a written finding will enable this Court to review as expeditiously as possible a defendant's appeal and any request for relief from a district court's determination that an appeal is frivolous and does not deprive the court of jurisdiction to proceed." 611 F.2d at 989. Here, the district court did not "elect[ ] to make the findings necessary to a demonstration of frivolousness or forfeiture" and did not retain jurisdiction. *Apostol,* 870 F.2d at 1340.

---

**2.** *See, e.g., Chuman,* 960 F.2d at 105 ("Because the district court did not certify this interlocutory appeal as frivolous or forfeited, the district court is automatically divested of jurisdiction to proceed with trial."); *Yates,* 941 F.2d at 449 ("Nevertheless, we decline to dispose of this appeal on waiver grounds. The district court has made no findings of frivolousness or waiver. Thus, we have exercised this court's jurisdiction to hear this timely filed ... appeal."); *Donges,* 915 F.2d at 577 ("*Apostol* ... recognized that it is the district court's *certification* of the defendant's appeal as frivolous or forfeited rather than merely

the *fact* that the appeal is frivolous which allows the district court to retain jurisdiction to conduct a trial. Other courts have similarly emphasized the need for a clear and reasoned finding of frivolousness or forfeiture by the district court in order to prevent the automatic divestiture of jurisdiction."). *But see Rivera–Torres,* 341 F.3d at 96 (Determining that formal certification was unnecessary when "[t]he defendants' notice of appeal was patently meritless, and therefore failed to divest the district court of jurisdiction in the first instance").

Thus, we deny BancPass's motion to dismiss and proceed to the merits of HTA's interlocutory appeal.[3]

## IV

 HTA argues that the district court erred by denying summary judgment based on Texas's judicial proceedings privilege. A motion for summary judgment is appropriate if the movant shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This court reviews de novo a district court's denial of a motion for summary judgment based on immunity, *Shanks,* 169 F.3d at 992, as well as its interpretation of state law. *Troice,* 816 F.3d at 345. We are "bound to answer the question the way the state's highest court would resolve the issue." *Id.* (quoting *Occidental Chem. Corp. v. Elliott Turbomachinery Co.,* 84 F.3d 172, 175 (5th Cir. 1996)). However, "[w]hen there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Shanks,* 169 F.3d at 993 (quoting *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.,* 953 F.2d 985, 988 (5th Cir. 1992)). Here, neither party identified binding precedent from the Texas Supreme Court that conclusively answers whether the judicial proceedings privilege should protect HTA's communications to TxDOT, Google, and Apple. Thus, we must make an *Erie* guess and predict how the Texas Supreme Court would resolve the issue if presented with the same case. *Chaney v. Dreyfus Serv. Corp.,* 595 F.3d 219, 229 (5th Cir. 2010). We conclude that Texas caselaw discussing

the privilege counsels against its application here.

 Under Texas law, "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made." *James v. Brown,* 637 S.W.2d 914, 916 (Tex. 1982) (per curiam). "This privilege extends to any statement made by the judge, jurors, *counsel, parties* or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *Id.* at 916–17 (emphasis added).

In nearly every state, including Texas, courts rely on the formulation of the privilege in the Restatement (Second) of Torts. *See Shell Oil Co. v. Writt,* 464 S.W.3d 650, 658 (Tex. 2015); Douglas R. Richmond, *The Lawyer's Litigation Privilege,* 31 Am. J. Trial Advoc. 281, 284 (2007). Section 586 of the Restatement—which describes the protection for attorneys—recognizes that the privilege may extend to communications made preliminary to judicial proceedings, providing that attorneys may "publish defamatory matter concerning another *in communications preliminary to a proposed judicial proceeding,* or in the institution of, or during the course and as part of, a judicial proceeding in which [the attorney] participates as counsel, *if it has some relation to the proceeding.*" Restatement (Second) of Torts § 586 (1977) (emphases added). Parties to judicial proceedings enjoy substantially similar protection under section 587 of the Restatement. *Id.*

---

**3.** BancPass assumes that proper certification by the district court would have required us to dismiss the appeal. Although we conclude that a district court that properly certifies the frivolousness of an immunity appeal may maintain jurisdiction, we do not reach the question of whether such certification divests this court of jurisdiction or otherwise requires dismissal of the appeal. We also do not reach the question of whether certification would have been appropriate here.

at § 587. Drawing on the Restatement's articulation, Texas appellate courts have extended the judicial proceedings privilege beyond the courtroom to communications made in contemplation of and preliminary to judicial proceedings. *See, e.g., Russell v. Clark,* 620 S.W.2d 865, 868 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.); *see also James,* 637 S.W.2d at 916 (finding that a witness's report to a judge was absolutely privileged and that a letter to an attorney was similarly privileged because it was written in contemplation of a judicial proceeding).

Despite this broad protection, the Restatement recognizes limits on the reach of the privilege, particularly when the communications are made outside of judicial proceedings. The comments to both section 586 and section 587 emphasize that for "communications preliminary to a proposed judicial proceeding, the rule stated in this Section applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration." Restatement (Second) of Torts § 586 cmt. e., § 587 cmt. e. The Restatement further warns that "[t]he bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." *Id; accord Shell,* 464 S.W.3d at 655. Texas courts have similarly warned of over-application of the privilege, cautioning that "[t]he privilege . . . cannot be enlarged into a license to go about in the community and make false and slanderous charges against his court adversary and escape liability for damages caused by such charges on the ground that he had made similar charges in his court pleadings." *De Mankowski v. Ship Channel Dev. Co.,* 300 S.W. 118, 122 (Tex. Civ. App.—Galveston 1927, no writ).

Based on the comments to sections 586 and 587, courts generally examine both whether the defendant contemplated litigation in good faith at the time of the communication and whether the statement had "some relation" to that contemplated proceeding. *See, e.g., Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 697 (8th Cir. 1979). We assume, as the district court did, that HTA contemplated in good faith the tortious interference claim it eventually brought (as a counterclaim) against BancPass. We also assume that Texas's judicial proceedings privilege extends to pre-judicial proceedings communications of attorneys and non-attorney parties alike, as indicated in section 587 of the Restatement. We focus instead on the relationship between the communications and HTA's tortious interference litigation against BancPass.

■ In determining whether a communication made prior to a contemplated judicial proceeding has some relation to that proceeding, "the court must consider the entire communication in its context, and must extend the privilege to any statement that bears some relation to an existing or proposed judicial proceeding." *Russell,* 620 S.W.2d at 870. We agree with HTA that Texas courts have broadly described the "some relation" requirement. *See, e.g., Odeneal v. Wofford,* 668 S.W.2d 819, 820 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) (noting that "[t]he standard is not 'relevance,'" in the legal sense, "but a lesser standard: the statement must only bear 'some relation to the proceeding'" (citation omitted)). However, as the district court observed, HTA has not identified an analogous case in which a Texas court applied the privilege in a situation like this, when the content of the communication was so attenuated from the litigation later claimed as the contemplated judicial proceeding. We read Texas caselaw as signaling limits

on which communications made prior to the initiation of litigation qualify as sufficiently related to the contemplated judicial proceeding identified by the defendant. We agree with the district court that these limits preclude application of the privilege here, most significantly, because of the disconnect between the purpose of the communications and HTA's later tortious interference litigation, as well as the circumstances of the third-party recipients.

 Although there is some conflict among Texas appellate courts,[4] Texas caselaw as a whole suggests that the pur-

pose—and not just the general subject matter—of a pre-judicial-proceeding communication should bear some relation to the contemplated litigation.[5] For example, Texas appellate courts have homed in on the legal rights the communication was attempting to secure and their connection to the legal rights that the potential litigant expected to pursue in the contemplated litigation.[6] Further, Texas caselaw is clear that our analysis must focus on the connection between the communications and the specific legal action HTA now claims that it was contemplating, rather than legal action more broadly.[7]

**4.** *Compare HMC Hotel Props. II Ltd. P'ship v. Keystone–Tex. Prop. Holding Corp.*, No. 04-10-00620-CV, 2011 WL 5869608, at *14 (Tex. App.—San Antonio, Nov. 23, 2011), *rev'd on other grounds*, 439 S.W.3d 910 (Tex. 2014) ("Unlike other [Texas] courts, this court has held, 'the privilege attaches if the statement has some relationship to a contemplated proceeding, regardless of whether it in fact furthers the representation.'" (citation omitted)), *and Bell v. Lee*, 49 S.W.3d 8, 11 (Tex. App.—San Antonio 2001, no pet.) (refusing to read *Russell* as requiring a litigation-related purpose), *with Daystar Residential Inc. v. Collmer*, 176 S.W.3d 24, 27–28 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (requiring that the communication further the attorney's representation, but noting that *Bell* holds to the contrary).

**5.** *See, e.g., Russell*, 620 S.W.2d at 868, 870 (stressing that "[t]he act to which the privilege applies must bear some relationship to a judicial proceeding in which the attorney is employed, *and must be in furtherance of that representation*" and further noting that the letter at issue bore "a relationship to the litigation about which it was written and ... appear[ed] to be designed to obtain information that may be used as evidence" (emphasis added)); *Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex. App.—San Antonio 1997, no writ) (emphasizing that "[t]he letter ... indicated that it was in regard to cause number 5846 in the Medina County Court at Law, the estate administration proceeding" and "was clearly written in an effort to secure the rights of appellee's client, the executor of the estate, in property and income belonging to the es-

tate"); *see also Brown v. Collins*, 402 F.2d 209, 213–14 (D.C. Cir. 1968) (stressing that, for a statement to be privileged, it must be "made in character of a litigant. ... Business conversations are not absolutely privileged merely because they deal with matters likely to end up in court in the future" and noting that "the mere mention of the possibility of suing the communicant [does not] automatically convert the entire conversation to one 'related' to a proposed judicial proceeding" (quotation marks and citation omitted)).

**6.** *See, e.g., Krishnan v. Law Offices of Preston Henrichson, P.C.*, 83 S.W.3d 295, 302 (Tex. App.—Corpus Christi 2002, pet. denied) ("In the ... letter, appellees explained the negligence claim against Dr. Caballero was based on the actions of appellant, who allegedly performed a tubal ligation on Rodriguez without her consent. By providing such details, appellees were merely informing Dr. Caballero of the negligence claim they were contemplating filing against him; the letter and its contents were serving as notice."); *Crain v. Smith*, 22 S.W.3d 58, 63 (Tex. App.—Corpus Christi 2000, no pet.) (noting that the statements contained in a demand letter "were factual allegations and legal conclusions that formed the basis of [the defendant's] proposed legal action").

**7.** *See McCrary v. Hightower*, 513 S.W.3d 1, 7 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Without adequate context, the court cannot reasonably determine whether the communications relate to *a particular judicial proceeding....* [T]he pleadings do not anchor

The letters to Google and Apple in particular put forward bare accusations of unlawful conduct that was unrelated to HTA's later tortious interference claim and that neither directly implicated HTA's own legal rights nor constituted legal claims that HTA had any ability to pursue.[8] Those letters did not even allude to the possibility of HTA's pursuing a tortious interference claim (or any legal action) against BancPass. The letter to TxDOT made vague references to possible legal action, but the references were entirely nonspecific.[9] Further, HTA did not ask for any assistance in pursuing legal action against HTA (or even identify what that hypothetical action might be), such as help in securing information, witnesses, or evidence. Instead, the letter to TxDOT was written "to express [HTA's] concern" with BancPass's actions, and the letters to Apple and Google demanded that the companies remove the PToll App from their online stores, though not based on any legal rights possessed by HTA.

▮▮▮▮ Moreover, Texas caselaw suggests that the circumstances of the third-party recipient—and that party's relationship to the contemplated litigation—is relevant to our analysis.[10] "Even statements

---

the defamatory communications to any particular lawsuit. While it is apparent from [the record] that the lawsuit ... was actually filed, the pleadings do little to affirmatively establish any nexus between [the allegedly defamatory] statements ... and that particular lawsuit." (emphasis added)).

8. *See McCrary*, 513 S.W.3d at 7 (emphasizing that "the privilege applies 'only when a communication has some relation to the proceeding that is *actually contemplated*'" (emphasis in original) (quoting Restatement (Second) of Torts § 588 cmt. e)); *Dall. Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 239–40 (Tex. App.—Dallas 2000, pet. denied) ("Under the facts of this case, we hold that the press release had some relation *to this lawsuit in particular and to other litigation between the same parties*. Therefore, the statements were privileged and cannot serve as the basis of a defamation action." (emphasis added)); *Crain*, 22 S.W.3d at 62 ("This privilege has been held by several courts to include communications by counsel in which the alleged wrongs suffered *by the client* are detailed. ... The rationale is largely that of the absolute privilege that attaches to allegations in a petition filed in court, in that the demand letter *is an attempt to alert the potential defendant of the grievance before suit is filed*." (emphases added)).

9. *See, e.g., HMC Hotel Props.*, 2011 WL 5869608, at *15 ("[T]he letter in question is written ... regarding alleged violations of the Lease .... Although the letter demands that [the recipient] comply with the Lease by taking certain actions, the letter never refers to a

judicial proceeding. ... In addition to not referring to a judicial proceeding, the letter in this case does not sufficiently suggest that a judicial proceeding is under consideration. Although the letter might be read to suggest that a judicial proceeding might be a possibility if the demands are not met, this bare possibility is not sufficient to satisfy the applicable standard."); *Thomas*, 940 S.W.2d at 344 ("The first sentence of the letter notified the reader that appellee was communicating in his capacity as the attorney representing Vernor Muennink as the independent executor of Leslie Muennink's estate. The letter also indicated that it was in regard to cause number 5846 in the Medina County Court at Law, the estate administration proceeding."); *DeLeon v. Eilers*, No. 04-96-00497-CV, 1997 WL 81650, at *2 (Tex. App.—San Antonio Feb. 26, 1997) ("The letter to the police chief must refer to a judicial proceeding to entitle the author to absolute immunity."). *But cf. Watson v. Kaminski*, 51 S.W.3d 825, 828 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("None of these cases, however, held that the communication *must* set forth the specific litigation anticipated." (emphasis added)).

10. *See, e.g., Russell*, 620 S.W.2d at 870 (highlighting that the third-party recipients of an attorney's allegedly-defamatory letter were potential witnesses who might have evidence to further the attorney's claim); *see also Asay*, 594 F.2d at 698 ("[The absolute privilege] cannot be a predicate for dissemination of the defamatory matter to the public or third parties not connected to the judicial proceed-

aimed at parties not involved in the [contemplated judicial] proceeding are absolutely privileged if they bear some relation to a judicial proceeding." *Thomas*, 940 S.W.2d at 344. However, in most jurisdictions, "for a communication to have some relation to a proposed or pending judicial proceeding, 'the recipient of the communications must have a direct interest in the litigation or possess evidentiary information relevant to it.'" Richmond, 31 Am. J. Trial Advoc. at 320 (quoting *Johnson v. McDonald*, 197 Ariz. 155, 3 P.3d 1075, 1080 (Ct. App. 1999)). Here, the relationship between the third-party recipients and the litigation identified by HTA was attenuated and hypothetical at best. The parties contacted by HTA had little interest in a possible tortious interference or defamation dispute between HTA and BancPass (indeed, the letters to Google and Apple did not even mention potential litigation between the two parties), and the judicial proceeding vaguely described in the letter to TxDOT was entirely hypothetical.

Denial of the privilege here is also consistent with our analysis in *Burzynski v. Aetna Life Insurance Co.*, in which we relied on Texas caselaw on the judicial proceedings privilege to deny immunity in substantially similar circumstances. *See* 967 F.2d 1063, 1068 (5th Cir. 1992). There, we examined the reach of Texas's protection of communications made in aid of discovery and, in doing so, drew on Texas's judicial proceedings privilege caselaw to determine whether the communications at issue had "some relation to the [contemplated judicial] proceeding." *Id.* at 1068

(citation omitted). Much like this case, the communications in *Burzynski* were sent by the defendant to third-party companies, attempting to dissuade them from doing business with the plaintiff. *See id.* at 1065–67. Although the letter in *Burzynski* described the specific litigation between the parties and was styled as an "informal discovery request," the communications were predominately composed of pejorative statements and warnings about fraudulent claims allegedly made by the plaintiff. *Id.* at 1065–66. We concluded that the communications were not protected under Texas law. *Id.* at 1069. In denying the privilege, we highlighted that the letters were sent to parties who could not "be reasonably believed to have cognizable legal interest in the litigation" and noted that the recipient companies' relationship to the litigation was "hypothetical at best." *Id.* at 1068–1069.

Although we do not perceive a clear answer in Texas Supreme Court or Texas appellate court decisions, we agree with the district court that application of the privilege here would be inappropriate. This conclusion is consistent with our prior reliance in *Burzynski* on judicial proceedings privilege caselaw to deny application of the discovery privilege. Accordingly, we conclude that the district court's denial of summary judgment based on Texas's judicial proceedings privilege was not in error.

**V.**

For the foregoing reasons, we DENY BancPass's motion to dismiss the appeal

---

ing."); *Sriberg v. Raymond*, 544 F.2d 15, 15–17 (1st Cir. 1976) (noting that a third party to the litigation at issue, an escrow agent, "may have been no more than a neutral stakeholder, ... [but] [t]he letter here suggests that the escrow agent, if not in complicity with the plaintiff, had at least been 'manipulated,' as part of a scheme by the plaintiff"); *Theiss v.*

*Scherer*, 396 F.2d 646, 648 (6th Cir. 1968) (noting that the letter at issue, which the court found covered by the privilege, "was addressed to an attorney who represented a party with a financial interest in the proceedings" and that "[c]opies of the letter were sent only to those who had a direct financial interest in the settlement of the estate").

and AFFIRM the judgment of the district court.